[File No. 7058]

MILDRED I. UDGAARD, Respondent, v. JOE SCHINDLER, et al., and Joe Schindler and Rose Schindler, Appellants.

(31 NW2d 776)

Opinion filed March 29, 1948

T. H. H. Thoresen, for appellants.
M. W. Duffy, Mackoff, Kellogg & Muggli, for respondent.

BURKE, J.   Plaintiff is the owner of a tract of farm land in Steele County.  The defendants, Joe and Rose Schindler, were at the time of the commencement of the action occupants and lessees of plaintiff's land.

In her complaint in this case plaintiff alleges two causes of action.   The first is a statutory action to determine adverse claims to real property and for damages for waste, the second is for damages for breach of the covenants of a lease.   Plaintiff claimed forfeiture of the defendants' lease for breach of its conditions and the right to possession of the land by virtue of a provision for reentry contained in the lease.   The defendants Schindlers, denied that they had breached their lease and counterclaimed against the plaintiff for damages for her alleged breaches of the lease.   During the trial of the case, the defendant Joe Schindler became ill and defendants' counterclaim, upon their motion, was dismissed without prejudice.   The trial resulted in a judgment in favor of the plaintiff and against the defendants Schindlers for possession of the land and for monetary damages.   The defendants, Joe and Rose Schindler, thereupon moved for a new trial.   This motion was denied by the trial court and these defendants then appealed from the judgment, demanding a trial anew in this court.

As to the defendant, Farmer's Union Elevator Association of Aneta, the judgment decreed merely that it held stored in the

defendant Schindler's name 825 bushels and 30 lbs. of wheat upon which plaintiff had a valid lien to secure the payment of the judgment in her favor. As to the other defendants the action was dismissed. None of these defendants has appealed.

The first question for decision arises upon a motion to dismiss the appeal. The motion is based upon the contention that the notice of appeal was served upon the plaintiff alone and not upon the parties defendant other than the Schindlers. At the time the motion to dismiss was filed, such was the case. However, before the time for appeal had expired and before the appeal was heard all parties had been served and they had entered appearances upon this appeal.

In our judgment there was no need for serving the notice of appeal upon the Schindler's co-defendants. Notice of appeal need be served upon adverse parties only. Section 28–2705 Rev Code 1943. An adverse party, within the statute relating to the service of notice of appeal, is one whose interest in the judgment or order appealed from is in conflict with the modification or reversal sought by appellant. Powell v. International Harvester Co. 41 ND 220, 170 NW 559; Colwell v. Union Cent. L. Ins. Co. 59 ND 768, 232 NW 10; Smith v. Grilk, 64 ND 163, 250 NW 787. Here, what is sought is a reversal or modification of the judgment against the defendants Schindler. Clearly, the defendants in whose favor judgment of dismissal was entered, have no interest whatever in this appeal. Since plaintiff did not appeal, they are out of the case. Nor is the modification sought adverse to the Farmer's Union Elevator Association. It remains in the case only as the bailee of wheat in which the plaintiff and the appealing defendants each have an interest. Whatever the decision upon this appeal may be it cannot affect any interest of the bailee but only the extent of the interest of the other parties. The motion to dismiss the appeal is therefore denied.

Before reaching the merits of the case there are other preliminary questions to decide. The first of these relates to the form of the action. The defendants contend that the statutory action to determine adverse claims is not a proper action to recover

possession of leased premises from plaintiff's tenants. The action to determine adverse claims "may be maintained by any person having an estate or an interest in, or lien or encumbrance upon, real property, whether in or out of possession thereof and whether such property is vacant or unoccupied, against any person claiming an estate or interest in, or lien or encumbrance upon, the same, for the purpose of determining such adverse estate, interest, lien or encumbrance." Section 32–1701, Rev Code 1943. In such action, "a recovery of possession also may be had by the plaintiff or any defendant seeking affirmative relief." Section 32–1702 Rev Code 1943. The action thus authorized "embraces both the common-law action of ejectment and the equitable action to quiet title." Ottow v. Friese, 20 ND 86, 126 NW 503. We think it clear therefore that an action to determine adverse claims will lie to recover possession of real property from a lessee who holds over after the termination or forfeiture of his lease. In such case the relationship of landlord and tenant has terminated and the claim of interest of the ex-lessee has become adverse to that of the ex-lessor. Universal Milk Co. v. Wood, 205 Cal 751, 272 P 745; Andrews v. Russell, 85 Cal App 149, 259 P 113.

The next question arises upon the defendants' claim that no notice to quit was given to them prior to the commencement of this action. We are agreed that this question is settled by statute. The lease in this case reserved to the lessor a right of reentry. Section 47–1704 Rev Code 1943, provides: "Whenever the right of reentry is given to any grantor or lessor in any grant or lease, or otherwise, such reentry may be made at any time after the right has accrued upon three days' previous written notice of intention to reenter served in the mode prescribed by section 47–1702."

Section 47–1705 Rev Code 1943, provides: "An action for the possession of real property, leased or granted with a right to reenter, may be maintained at any time after the right to reenter has accrued, without the notice prescribed in section 47–1704."

Defendants contend that these sections of the code are not applicable here for the reason that they are found in Chapter

47–17 of the Rev Code of 1943, which is entitled, "Termination of Estates at Will." The language of the sections quoted is clearly at variance with chapter title. Section 47–1704 refers to a right of reentry reserved in any *grant or lease, or otherwise.* Certainly this language is all inclusive. Further, our examination of the history of Chapter 47–17 discloses that it was first adopted as Chapter 2 of Title 2, Part 2 of the Civil Code of 1877 with the title "Termination of Estates" not estates at will. The chapter has been carried forward in every codification or compilation of Dakota and North Dakota Laws since that time without change. In 1889, 1895, 1899, 1905 and in 1913 the chapter title was "Termination of Estates." However, in 1943, the Code Commission, without explanation, changed the title to "Termination of Estates at Will." Chapter titles are entitled to consideration in the construction of a code section included thereunder, if the section is ambiguous or otherwise unclear. 50 Am Jur 467, 468, Statutes, § 450; 59 CJ 1007, 1008, Statutes, § 599; note in 37 ALR 1078 et seq. The language of §§ 47–1704 and 47–1705 is clear. There is no need for any extraneous aid to construction. Further the chapter title has value as evidence only and the evidentiary value of this chapter title is practically nullified by the fact that at the time of the chapter's adoption and for sixty-six years thereafter it had a different title. It follows that defendants' contention cannot be sustained and § 47–1705 Rev Code 1943 must be held to apply to this action.

Next for consideration is defendants' contention that they were entitled to a jury trial. The claim is that where the action to determine adverse claims is of the nature of the common law action of ejectment rather than that of the equitable action to quiet title, it is, regardless of form, an action at law to be tried to a jury. There is much to be said for defendants' contention. It is, however, unnecessary to decide that question here, for even though defendants were entitled to a jury trial they waived that right. The record shows that the trial judge set the case for trial without a jury and that the defendants went to trial without objection or demand for a jury trial. They raised the question for the first time, upon a motion for a new trial. Certainly the

defendants could not voluntarily submit the issues of a case to a court without a jury and hold in reserve their claim of a right to a jury trial in the event the decision should go against them. 35 CJ 204, Juries § 114; 31 Am Jur 590, 591, Jury, § 45.

In their answer the defendants had pleaded that the issue as to possession was res adjudicata by reason of a prior final judgment entered in an action in forcible entry and detainer brought by the plaintiff against the defendants in justice court of Griggs County. The denial of the plea in bar is urged as error. The justice's docket which is in evidence discloses that the action in that court was dismissed without prejudice. Such a judgment does not adjudicate any issues, 50 CJ 70, Judgments, § 635. It is not a bar to subsequent action. Prondzinski v. Garbutt, 10 ND 300, 86 NW 969. Defendants say, however, that the docket entry is in error, that the issue as to the right of possession was fully tried and that the action for possession was dismissed upon its merits. Section 33–0113 Rev Code 1943, provides: "A justice docket is deemed true and correct as to all matters appearing therein as required by law and cannot be disputed in a collateral proceeding. The docket or a duly certified transcript thereof is competent evidence of the matters to which it relates."

Defendants may not therefore challenge the correctness of the docket in this action.

Upon the merits the principal issues arise upon differences between the plaintiff and the defendants in the interpretation of the lease under which defendants farmed plaintiff's land. The terms of the lease were first agreed to orally by the parties and the defendants moved upon plaintiff's land on November 11, 1944. Thereafter plaintiff caused a written lease to be prepared. By the terms of the lease, defendants were to occupy and farm plaintiff's land for a period of three years. The written lease was presented to the defendants on December 9, 1944, and after some discussion as to its provisions they signed it the same day. The chief difference between the parties concerns their construction of the provisions of the lease with respect to the payment of the threshing bills in 1946 and 1947. Plaintiff contends that this responsibility rested entirely upon the defendants

while defendants say it was to be divided equally by the parties. Two provisions of the lease, one a typewritten portion and the other a printed portion, must be considered in reaching a construction. The typewritten portion is as follows: "Said party of the second part (plaintiff) to furnish all seed necessary to sow and plant said land and 1st party (defendants) to pay all of the threshing bill for threshing the grain raised during the year 1945. All labor, twine is to be furnished by party of the first part. Both parties are to furnish one half of all seed seeded on the farm for 1946 and 1947."

The printed section of the lease contains the following: "The party of the first part agrees . . . to crop and cultivate said lands and harvest, thresh and secure the crop grown thereon in farmer-like style and in the best possible manner during said season . . . ."

Both parties agree that the typewritten portion of the lease makes no provision for the payment of the threshing bill in 1946 and 1947. Plaintiff says the printed section of the lease takes care of the omission, if it be one, and places the responsibility for payment entirely upon the defendants. Defendants, on the other hand, urge that the typewritten portion does not contain the entire agreement between the parties and that it may be supplemented by oral testimony, that the printed section of the lease may not be substituted for the omitted part of the agreement for to do so would only create an ambiguity which also may be explained by parol evidence.

The lease is a standard form for leasing farms on shares. Its printed portion contains general provisions applicable to all leases on shares. It is common knowledge that the principal variables entering into such leases, for which special provision must be made in each lease, relate first, to the percentage of the crop the landlord is to receive and second, to the responsibilities of the parties respectively for furnishing seed and for payment of the threshing bill. The degree in which the tenant assumes liability for the latter items ordinarily depends upon the size of the landlord's share of the crop. In view of this fact it is doubtful if a general provision, intended to be applicable to all

leases on shares, by which the tenant agreed to thresh the crop in a farmer-like style was intended as an agreement that he would also pay the entire threshing bill. From a consideration of the lease in this case it is evident that the parties, at the time of the execution of the lease did not so construe this provision. The lease specifically requires the defendants to pay all the threshing bill for the crop year 1945. The presence of this special provision suggests the inference that the parties did not consider that the lease otherwise provided that the defendant should pay the threshing bill. And limiting the requirement to pay the entire threshing bill to the year 1945 suggests that a different arrangement was contemplated for the years 1946 and 1947. What that arrangement was is not set forth in the contract. The inference that there was such an arrangement is sufficiently strong to allow the admission of parol evidence, not to vary the terms of the written contract, but to show an agreement between the parties additional to and not inconsistent therewith. Putnam v. Prouty, 24 ND 517, 140 NW 93; 32 Am Jur 136, Landlord and Tenant, § 133; 35 CJ 1189, Landlord and Tenant, § 492.

The testimony of the defendant Joe Schindler as to this agreement is as follows:

Q. "Well, did you point out to her (the plaintiff) some of the features of the lease that you didn't understand and that she explained to you?"

A. "One, just one paragraph here, and it is this one here, about where we were supposed to furnish half of the seed in 1946 and '47."

Q. "Did you ask her what that meant?"

A. "I asked her this way. I said, 'what about the threshing?' She says, 'We figure that in 1946 and '47 it will be 50–50 all the way.' "

Upon cross examination plaintiff was asked if the foregoing conversation did not take place and she replied, "I don't recall that." In view of the testimony of the parties, and the circumstances of the execution of the lease we are satisfied that the

parties agreed to share the threshing bills equally in the years 1946 and 1947.

At the time the defendants entered into possession of plaintiff's farm there was stored thereon certain hay and grain which belonged to the plaintiff. The lease provided: "The same amount of hay and feed and the other grain that is furnished in 1945 is to be replaced by the party of the first part to the party of the second part and the difference of all grain and feed at that time is to be sold for cash and the proceeds to be divided 50–50 by the party of the first part and the party of the second part." The parties cannot agree upon a construction of this provision. Plaintiff contends that the replacement was to be made out of defendants' share of the crop while defendants say the replacement was to be made from the joint crop. Upon this question, we see little room for dispute. The provision that the difference remaining, after the replacement had been subtracted, should be divided equally, clearly indicates that the replacement was to be made from the whole or joint crop.

In this connection plaintiff also contends that defendants should replace the grain that was used for seed in 1945. In this she is clearly wrong for to require the defendants to replace this seed would completely nullify her agreement to furnish the seed for that year.

The particular acts of the defendants which plaintiff claims were breaches of the conditions of the lease sufficient to justify its forfeiture are many. First, are the acts which plaintiff alleges were waste. They include the filling in of a well, the tearing down of a feed rack and failure to keep the fences in repair. It is undisputed that the well was dry at the time defendants entered upon the premises, that it was caving in around the edges and that the defendant Joe Schindler filled it after a hog had been killed by falling into it. It is undisputed, that the feed rack was in a poor state of repair at the time defendants took possession. Joe Schindler testified that he tore it down because it had become dangerous; that he used the few sound supporting posts it contained to replace broken fence posts and piled the rest of the lumber in the yard. At the time these acts took place

plaintiff was living upon the premises. Without the consent of the defendants and without objection by them she had moved a small house upon the farm in the spring of 1945 and taken up her residence therein. She must have known what was taking place, yet she made no objections and offered no suggestions. Months later in the fall of 1946 during all of which time she dealt with defendants as her tenants, she claimed a breach of the conditions of the lease. The claim came too late. If defendants' acts did constitute a breach, plaintiff had waived the right to forfeiture. There was a clear recognition of the continuation of the tenancy after plaintiff had knowledge of the alleged breach. Such recognition is a waiver of a right to forfeiture. 32 Am Jur 747, Landlord and Tenant, § 882; 35 CJ 1079, Landlord & Tenant, § 254. Hanson v. Hanson Hardware Co. 23 ND 169, 135 NW 766. Upon the allegation that defendants committed waste by failing to keep the fences in repair there is a complete failure of proof.

We shall next consider the alleged breaches of the lease in connection with the sale of live stock. By the terms of the lease the defendants expressly agreed "not to sell or remove or suffer to be sold or removed, any of the produce of said farm or premises, or the stock, increase, income or the products herein mentioned, of any kind, character or description, until the division thereof, without the written consent of the party of the second part." The lessor had provided foundation stock for the farm including cattle, hogs and sheep. According to the lease, all increase from the foundation stock was to be divided equally between the lessor and the lessees. It is undisputed that in 1945 and 1946 certain animals were butchered to furnish meat for the lessees and their family. It is also undisputed that in 1945 and again in 1946, two steers were given to the Schindler boys for 4H Club work. It is clear that plaintiff is entitled to an accounting for the animals thus taken, but if the taking constituted a breach of the lease, she has waived her right to forfeiture on that account. She knew of the taking, made no complaint and thereafter continued to treat defendants as lessees. As we

have heretofore pointed out a recognition of the continuation of a lease after a breach is a waiver of the right to forfeiture.

It appeared, however, that defendants sold two ewes to a locker plant at Binford in August or September, 1946, without plaintiff's knowledge or consent. They did not notify plaintiff of the sale or divide the proceeds with her. This is clearly a breach of the conditions of the lease and one which under the terms of the lease gave the plaintiff a right to forfeiture.

Other breaches of the lease which gave rise to a right of forfeiture include the sale by defendants of grain belonging to the plaintiff and the refusal of the defendants to allow the plaintiff to sell her share of the increase in live stock in the fall of 1946. There is no need to discuss these matters in detail as the existence of a single breach justifying forfeiture is sufficient to affirm the trial court's finding that the lease had terminated.

Upon the accounting between the parties the trial court found that the defendants were indebted to the plaintiff as follows:

(1) For 960 bushels of oats at 60¢ per bushel amounting to the sum of $576.00

(2) For 1035 bushels of barley at $1.00 per bushel amounting to 1035.00

(3) For 20 acres of cane at $7.50 per acre 150.00

(4) For 54 tons of hay at $7.50 per ton 405.00

(5) For 110 bushels of oats at 46¢ per bu. 50.60

(6) For destruction of the feed rack 50.00

(7) For well filled in 50.00

(8) For sale of 1 sheep 10.00

(9) For one half barley sold to pay for seed corn $16.50

And excess in barley sold for which Schindler received cash 5.00

Amounting to total of 21.50

(10) For hogs retained by defendants in addition to what has already been paid 127.11

(11) For cattle retained by defendants in addition to payments made 155.21

    (12) For seed wheat furnished in 1945 which was
           not sown. 85 bushels at $1.97 a bu.      167.45
    (13) For gasoline, kerosene, grease, etc.       28.00

Items one to five inclusive are charges for grain and feed which were on the farm at the time defendants entered into possession. Each of these items is challenged upon the grounds that the computation was made upon the theory that the replacement was to be made out of the defendants' share of the crop and that no deductions were made for the seed which plaintiff contracted to furnish in 1945. Item one, is also challenged upon the ground that no deduction was made for the 110 bushels of oats sold by defendants from this store and which was separately charged against them in item five. The trial court found that there were 960 bushels of oats and 1035 bushels of barley on the farm when defendants took over. We think the finding as to the oats was correct, but that as to the barley it was incorrect. Plaintiff herself testified that there were 960 bushels of each. She also testified that after seeding there remained 760 bushels of oats and 815 bushels of barley. There is no evidence that there was any other oats on the place. If the defendants sold some of the oats which was on the farm when they took possession it must have been taken from this store of oats. If they are to be charged for the amount sold separately, as they are in item five, the amount thereof must be deducted from the amount to be replaced.

We have already held that replacement of the grain and feed was, according to the terms of the lease, to be made out of the joint crop and that there should be deducted from the amount to be replaced the amount which was used for seed in 1945. Accordingly the amount of oats to be replaced was 760 bushels and the amount of barley was 815 bushels, the replacement to be made by the landlord and tenant equally. Since the landlord received no benefit from the 110 bushels which were sold, it is proper to charge this entire amount against the tenant. As it is charged as a separate item the amount thereof must be deducted from the 760 bushels. Defendants should therefore

be required to replace or pay for one half of 650 bushels or 325 bushels of oats and one half of 815 bushels or 407½ bushels of barley. The trial court found the value of the oats to be 60 cents a bushel and the value of the barley to be $1.00 a bushel or the approximate value at the time the 1945 crop was sold. Plaintiff objects to this finding upon the ground the proper measure of value was the value of the grain at the time of forfeiture of the lease. In this she is correct. According to the lease defendants were required to replace the grain. They must either replace it or give plaintiff the equivalent of replacement. The evidence established that at the time of forfeiture the value of barley was $1.75 a bushel and that of oats was 83 cents a bushel.

Both parties complain as to item four. Plaintiff says that the finding of $7.50 a ton as the value of the hay is not enough and defendants say the finding as to the amount of hay is too great. There is evidence that the hay was worth more than $7.50 a ton. There is also plaintiff's own testimony that it was worth $6.00 a ton. As to the number of tons Schindler himself testified that there were fifty-four. In view of this testimony, the finding of the trial court upon this item will be affirmed.

Items six and seven by which the defendants are charged fifty dollars each for the filling in of an old well and for the destruction of a feed rack, are challenged upon the ground that there is no evidence that the plaintiff suffered any damage by reason of these acts. We have already mentioned these matters in discussing waste as a ground for forfeiture of the lease. The well was dry and caving in. The plaintiff conceded that the feed rack was in poor repair and the defendant testified it had become dangerous. Although plaintiff was present on the farm when the well was filled in and the feed rack torn down, she made no objection and she made no claim for compensation. In view of the testimony and all of the circumstances we are of the opinion that the evidence does not sustain plaintiff's claim of damages and that items six and seven should be stricken.

As to item eight there is no controversy.

Item nine is a charge for barley sold by the defendant to pay

for seed corn. This charge is clearly incorrect. The record shows that defendants purchased three hundred pounds cane seed at $9.50 per cwt. and four bushels of seed corn at $5.00 bushel in the spring of 1946. To apply upon the total charge, defendants delivered twenty-five bushels and thirty pounds of barley from the joint crop for which he received a credit of $33.50. The balance Joe Schindler paid in cash. According to their agreement, plaintiff and defendant were each to pay for half the seed, each owned one half interest in the barley, so that as a result of this transaction plaintiff became indebted to defendants in the sum of $7.50. Item nine in the account will therefore be stricken and defendants will be given credit for $7.50 in their account with the plaintiff.

Items ten and eleven are for hogs and cattle used or sold by the defendants. Without going into details the record shows that in 1945 the defendants kept five hogs for butchering and gave three to the plaintiff. The two hogs excess taken by the defendants averaged 175 pounds each. In 1946 the defendants received an excess of five hogs of a total weight of 1132 pounds. For the two years the excess weight received by the Schindlers amounted to 1482 pounds. As Schindler had a half interest in the hogs taken he would be indebted to pay the plaintiff for 741 pounds. Plaintiff contends that settlement must be made upon the basis of the price at which the last hogs were sold in 1946 or at $22.90 per cwt. Defendants say, the price should be computed on the average price for all hogs sold or at $16.42 per cwt. Because the hogs were taken with the consent of the plaintiff as is shown by the fact that she herself, took three hogs for butchering in 1945, settlement should be made upon the basis of what the price was at the time the hogs were taken. As to the time they were taken the record is not clear except as to the year. This was a matter that was peculiarly within the knowledge of the defendants. In view of their failure to offer specific evidence thereon we think plaintiff should be given the benefit of any doubt. We therefore hold that for the hogs taken in 1945, defendants should pay the highest price for hogs sold in that year and for those taken in 1946, the highest price in that

year. Accordingly, they are indebted to plaintiff for 175 pounds at $12.50 per cwt. and for 566 pounds at $22.90 per cwt. or a total of $151.49. The record shows that, in attempting to make a settlement for the hogs defendants caused plaintiff to be paid $119.50 more than her half share of the proceeds of the sales. It appears therefore that upon this item defendants are indebted to plaintiff in the sum of $31.99 and item ten will therefore be reduced to that amount.

With respect to item eleven the record shows that defendants kept four calves in 1945 and one calf and two steers in 1946. Plaintiff contends that all of these should be paid for at the average price per head the steers sold for in 1946. Defendants say they should be paid for by the pound at the average price per pound received upon the sale of the cattle. For the reasons heretofore stated we think they should be settled for upon the same basis as the settlement for the hogs. However, no cattle were sold in 1945 and those that were sold in 1946 were all sold on December 10th, 11th, and 12th. It is apparent therefore that the difference in price was due chiefly to the difference in grade. Since the majority of the cattle kept by defendants were kept for 4H Club work, presumably they were the pick of the crop. They should all be settled for on the basis of the price received for the highest grade. Defendants retained 3296 pounds or 1648 pounds more than their half share or a value, at $15.50 per cwt. or $255.44. In attempting to make settlement with the plaintiff for the cattle defendants caused her to be paid $186.74 more than her half share of the proceeds of the sales. This leaves a balance of $68.70 due the plaintiff and item eleven will be reduced to that amount.

Item twelve of the account is for seed wheat which it is claimed was furnished for the 1945 crop and was not sown. Plaintiff testified that there were three hundred bushels of seed wheat upon the farm at the time defendant took possession. Upon her theory of the case the maximum amount which could have been seeded was two hundred fifteen bushels. This charge is for the balance of eighty-five bushels. Concerning this item the de-

fendant Schindler testified: "We cleaned that seed with a fanning mill and we cleaned out 97 bushels and there was approximately about four bushels of screenings out of that wheat she said was for seed. . . . I wrote to Mildred (plaintiff) and told her I needed seed and later on her mother told us to take some seed out of the big bin. There was 1800 bushels or so, take it to town and trade it for good seed, and this is what was done. I think we got about—I couldn't tell you right off, but approximately, as near as I can remember, somewhere around 40 or 44 bushels of clean seed. We got it from the Farmer's Union Elevator." With this seed he planted 110 acres. He also stated, "Later on we was not through seeding wheat and Miss Udgaard came down and asked us if we would take some of that wheat without cleaning it and make it 123 acres. We had a little piece left between two fields. So we went to work and when we got through drilling there was 123 acres." Miss Udgaard did not deny the specific transactions with her and her mother related by Schindler. The manager of the Farmer's Union Elevator testified as Miss Udgaard's witness and he was not questioned concerning the transaction with the elevator. While the barley and oats on the farm were measured when Schindler took possession, the wheat was not. In view of all the circumstances we find that the evidence is insufficient to sustain this item and it will therefore be stricken.

Upon item thirteen there appears to be no conflict. It will therefore remain unchanged.

Recapitulating we find the indebtedness of defendants to plaintiff is as follows:

| | |
|---|---:|
| For oats 325 bu. @ $.83 per bu. | $269.75 |
| For barley 407½ bu. @ $1.75 per bu. | 713.12 |
| For cane 10 acres @ $7.50 per acre | 75.00 |
| For hay 27 tons @ $7.50 per ton | 202.50 |
| For oats 110 bu. @ $.83 per bu. | 91.30 |
| One sheep | 10.00 |
| For hogs | 31.99 |
| For cattle | 68.70 |
| For oil and gasoline, etc. | 28.00 |
| **Total** | **$1490.36** |

The trial court found that plaintiff was indebted to the defendants as follows:

1. For two-fifths of the total cost of the harvesting and threshing for 1946 less the sum of $262.50 which plaintiff has paid      $221.50
2. For damages for moving a building on the leased premises.      50.00
3. For one-half the natural increase of 16 cows taken from the farm in the fall of 1945.      231.00
4. For excess plowing done, 63 acres at $1.50 per acre.      94.50

With respect to item one of this account, we have held that plaintiff agreed to pay one-half of the threshing bill. The total bill was $1,165.00. Plaintiff's share was $582.50. Deducting $262.50 which she has paid, the balance due is $320.00. This item will be raised to that amount.

Items two and three are for claims made in defendants' counterclaim. The counterclaim was dismissed without prejudice. No evidence to support these items is in the record and they are therefore stricken.

As to item four, the defendants contend that the evidence establishes a greater excess in plowing than that allowed by the trial court. It is clear that the trial judge was not satisfied with the evidence, in regard to the amount of plowing. In his original findings he directed an actual measurement of the plowing

by three persons, one to be appointed by the plaintiff, one by the defendant and one by the court. In a subsequent order, when it appeared that the defendants had appointed no one to act for them the court directed "In the event no such representative is appointed prior to April 28, 1947, plaintiff is authorized and directed to fix said plowing at 293 acres and to give Schindlers credit for sixty-three acres of plowing in excess of the two-hundred and thirty acres done at the commencement of the lease." In view of all the circumstances we are agreed that the trial court's finding as to this item should be affirmed.

In addition to the sums found by the trial court as due defendants from plaintiff, the defendants claim they are entitled to credit for their share of 117 bushels of oats sold in the fall of 1945 in the name of the plaintiff and also credit for plaintiff's unpaid share upon the purchase of 178 bushels of durum wheat seed in the spring of 1946. The sale of the oats netted $52.63. It was a sale of part of the joint crop, according to the record, and defendants are entitled to the claimed credit of $26.31. As to the durum wheat seed, the record is clear that defendants purchased the seed in the spring of 1946, that the cost of the seed or $338.20 was paid entirely by the defendants, that the seed was sown upon plaintiff's land and that it was plaintiff's obligation to pay for half the seed in 1946. In her testimony plaintiff conceded the obligation. Credit must therefore be given to the defendant for this item. As has been heretofore mentioned the defendants are entitled to a credit of $7.50 on the purchase of seed cane and corn in 1946.

Recapitulating we find the amount due from the plaintiff to the defendant to be as follows:

| | |
|---|---:|
| For the balance of one-half the threshing bill | $320.00 |
| For excess plowing | 94.50 |
| Credit on seed corn and cane | 7.50 |
| For oats from joint crop sold in plaintiff's name | 26.13 |
| For durum wheat seed | 169.10 |
| Total | $617.41 |

Deducting plaintiff's indebtedness of $617.41 from $1490.36 due her from the defendants there remains a balance in plaintiff's favor in the sum of $872.95.

The judgment giving possession of the leased premises to the plaintiff will be affirmed while the money judgment will be modified in accordance with the findings set forth in this opinion. Costs on appeal will be awarded the defendants.

CHRISTIANSON, Ch. J., and NUESSLE, J., and GRIMSON, District Judge, concur.

BURR and MORRIS, JJ., did not participate.