DANIEL et ux.   v.   HAMILTON et al.

DANIEL et al.   v.   HAMILTON et al.

No. 7369.

Supreme Court of North Dakota.

Nov. 18, 1953.

Rehearing Denied Dec. 4, 1953.

Dean Winkjer, Williston, Everett E. Palmer, Williston, for plaintiffs and respondents.

Strutz, Jansonius & Fleck, Bismarck, for defendants and appellants.

SATHRE, Judge.

These cases are here on appeal by the defendants from a judgment in favor of the plaintiffs rendered by the district court of Williams County, North Dakota. Both cases grew out of the same facts and the defendants are the same in both. It was agreed therefore by the respective parties and their attorneys to consolidate the cases and try them together. For the purpose of this opinion the case of J. H. Daniel and Rose Daniel will be referred to as case No. 1, and the case of F. B. Daniel and Mary V. Daniel will be referred to as case No. 2. The actions were brought for the purpose of cancelling certain oil, gas and mineral leases executed and delivered by the plaintiffs to the defendants upon certain lands in Williams County, North Dakota. The plaintiffs in case No. 1 were owners of the following described lands: The Southeast Quarter (SE¼) of Section Four (4); Southeast Quarter (SE¼) of Section Nine (9); South Half of the Southeast Quarter (SE½ SE¼) and Southwest Quarter (SW¼) of Section Three (3); West Half (W½) of Section Ten (10); Southwest Quarter (SW¼) of Section Thirteen (13); Southwest Quarter (SW¼) of Section Fourteen (14); Northeast Quarter (NE¼) of Section Fifteen (15) all in Township One Hundred Fifty-six (156) North, Range Ninety-eight (98) West of the Fifth Principal Meridian.

The plaintiffs in case No. 2 were the owners of the following described land: The North Half of Section Nine (9); Northeast Quarter (NE¼) of Section Sixteen (16); all in Township One Hundred Fifty-six (156) North, Range Ninety-eight (98) West, containing Four Hundred Eighty (480) acres more or less.

The amended complaints allege that the plaintiffs are the owners of the lands described, and that on the 11th day of April 1951 they executed and delivered to the defendants certain oil, gas and mineral leases upon said described land and that the leases were recorded in the office of the Register of Deeds of Williams County, North Dakota, on the 21st day of April 1951; that on the 11th day of April 1951, the date of the execution of the leases, the defendants issued drafts as follows: to the plaintiffs in case No. 1, $1,360 and to the plaintiffs in case No. 2, $400, drawn on the American State Bank of Williston, Williston, North Dakota, which drafts were payable on the approval of title to said lands within fifteen days; that said drafts were duly presented to the American State Bank of Williston and were not paid; that the leases were secured by the defendants by fraud in that they agreed that payment was to be made of said drafts in accordance with the terms thereof, but that the defendants have failed to pay the drafts and never intended that they should be paid; that the plaintiffs are entitled to the immediate possession of said described real property; that the defendants claim certain estates or interests in or liens or encumbrances upon said real property adverse to the plaintiffs, but that such claims are junior and inferior to the right, title and interest of the plaintiffs in said described real property; that the relief sought consists wholly in excluding the defendants and each of them from any interest in or lien or encumbrance upon the real property, but that no personal claim is made against any of said defendants.

At the close of the trial plaintiffs were permitted to amend their complaints by adding an allegation that:

"no consideration of any kind or character for executing said oil, gas or mineral lease was received by the plaintiffs from the said defendants."

It was stipulated that the answers of the defendants herein should stand as a denial of the allegation in plaintiffs' amended complaints.

Judgment is demanded that the said described oil, gas and mineral lease be cancelled and rescinded; that the title to said described lands be quieted in the plaintiffs as to any and all claims of the defendants and that the defendants and each of them be forever debarred and enjoined from asserting same.

In their answers the defendants admit that the plaintiffs are the owners of the real property described in the complaints and that they executed and delivered the gas, oil and mineral leases to the defendants; that on the date of the leases their agent, H. F. Leverenz, issued to the plaintiffs the drafts described in the complaints; that the defendants did at all times have money in the American State Bank available for payment of said drafts upon presentation thereof and have at all times been ready, willing and able to pay the same; that if said drafts were presented and were not paid, it was due to error and mistake on the part of the bank on which they were drawn, and to no fault of the defendants; that the defendants again tender the monies so on deposit in the bank in Williston, North Dakota, and demand that the plaintiffs withdraw the same in payment of the drafts issued thereon. The defendants specifically deny that the leases described in the complaint were secured by fraud, and they allege that the same were secured through the utmost good faith on the part of the defendants; that the plaintiffs failed and neglected promptly to notify the defendants of the error and mistake on the part of the bank in refusing to honor the drafts issued by the defendants; that had such notice been given, the defendants at once would have corrected said error and mistake and the drafts would have been paid. It is further alleged that the plaintiffs have at no time tendered or returned the said drafts to the defendants, but have held and retained the same and still have them in their possession; that by reason thereof the plaintiffs have waived and lost their right of action, if any they had, other than the right of action to recover upon said drafts; that the title of the plaintiffs to the lands described in the complaints is subject to the rights of the defendants under the said leases executed by the plaintiffs. Judgment is demanded that plaintiffs' actions be in all things dismissed; that the plaintiffs be required to accept the money tendered and heretofore deposited for the payment of the amount due on the drafts described in the complaint.

At the opening of the trial the defendants made a motion that the plaintiffs be required to elect what form of action they relied upon for the reason that under the allegations in the complaints there was uncertainty as to whether the actions were brought to determine adverse claims, for cancellation, or for rescission of contracts on the ground of fraud. The motion was denied and the cases were tried on the merits.

The leases which it is sought to cancel in these actions are the usual oil, gas and mineral leases. They provide among other things that:

"the lessor for and in consideration of $10.00 cash in hand paid, receipt of which is hereby acknowledged and of the covenants and agreements hereinafter contained on the part of the lessee to be, kept and performed, has granted, demised, leased and let, and by these presents does grant, demise, lease and let exclusively unto said lessee with the exclusive right of mining, exploring, etc. * * * all that certain tract of land situated in the county of Williams, North Dakota. (The land described in the complaint.)

 *    *    *    *    *    *

"if no well be commenced on said land on or before one year from the date hereof, this lease shall terminate as to both parties, unless the lessee on or

before that date shall pay or tender to the lessor or to the lessor's credit in the American State Bank of Williston, N. D., or its successors, which shall continue as a depository regardless of change in ownership of said land, the sum of $680.00 which shall operate as a rental and cover the privilege of deferring of the commencement of a well for twelve months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively. All the payments or tenders to be made by check or draft of lessee or any assignee thereof, mailed or delivered on or before the rental paying date. * * *

"It is understood and agreed that the consideration first recited herein, the down payment, covers not only the privilege granted to the date when said first rental is payable as aforesaid but also the lessee's options of extending that period as aforesaid and any and all other rights conferred."

It was mutually agreed that all rental payments under these leases should be tendered to the lessors at the American State Bank of Williston.

The leases were identical except for the names of the grantors and the amount of the rentals.

The defendants retained the original leases and copies were given to the plaintiffs to which were attached the drafts referred to in the amended complaints. The lease in case No. 1 was introduced in evidence as plaintiffs' exhibit 1, and the lease in case No. 2 was introduced as plaintiffs' exhibit 4.

The drafts were signed "Hamilton and Leverenz, by H. F. Leverenz," and were introduced in evidence as plaintiffs' exhibits 2 and 5, respectively and are as follows:

"$1360.00                April 11, 1951

On approval of title within 15 days, pay to the order of J. H. Daniel, One thousand three hundred sixty and no/100 dollars.

Value received and charge the same to account of

                Hamilton & Leverenz,
                    By H. F. Leverenz,
To American State Bank
No. Williston, North Dakota."

"$400.00                April 11, 1951

On approval of Title within 15 days, pay to the order of F. B. Daniel, Four hundred and no/100 dollars.

Value received and charge the same to account of

                Hamilton & Leverenz
                    By H. F. Leverenz
To American State Bank, Williston, North Dakota."

F. B. Daniel testifying for the plaintiffs stated that on the 10th day of May 1951 he wrote a letter to the American State Bank at Williston, in which he enclosed his own draft for $400, plaintiffs' exhibit 5, and his father's draft in the sum of $1,360, plaintiffs' exhibit 2. These were the drafts attached to the respective leases executed by the plaintiffs. He testified further that the drafts were not paid when presented on May 10, 1951 and were not paid on May 31, 1951. On the latter date his father J. H. Daniel and he went to the bank at Williston and consulted with Davidson, Sr., president of the bank, with reference to the nonpayment of their drafts and that they withdrew them from the bank at that time and took them to the office of their attorney at Williston.

Mr. H. F. Leverenz, testifying for the defendants, stated that on April 19, 1951 he opened an account in his own name at the American State Bank at Williston and on that date deposited $1,000 for which he was given credit. On April 25, 1951 he deposited $2,250 to the same account. He was not sure which one of the bank personnel received the deposit but he told him that the money was there to take care of the Daniel drafts. He heard nothing more about the Daniel leases or drafts until the last week in May 1951 when he met Roman Daniel at a gas station in the city of Ray, and that Roman inquired whether he could cash his draft and Leverenz replied that the money

was in the bank and had been there a long time; he was surprised that the draft had not been paid; he was in the American State Bank of Williston on May 7, 1951 and talked to one of the men in the bank who he thought was Harding. He called his attention to the Daniel drafts and told him specifically to pay them.

Mr. Owen Harding, vice president of the Williston State Bank, testifying for the plaintiffs stated that he was in the bank when the letter enclosing plaintiffs' exhibits 2 and 5 was received; that he notified Mr. Leverenz that the bank had these drafts for collection and asked him if it were O.K. to pay them and that Mr. Leverenz replied that they were not ready to be paid yet and that he would let them know when they were ready for payment; that the drafts were received in the bank on the 11th day of May 1951 but he could not recall the date when he notified Leverenz that the bank had the drafts for collection, but he was sure that it was within or before the fifteen days were up. Harding stated further that the drafts had not been paid because payment had not been authorized by Mr. Leverenz; that the defendants had drawn several sight drafts in favor of other sons of J. H. Daniel involving similiar lease transactions, and that two of these drafts had been charged to the deposit made by H. F. Leverenz; but that such payment was made only after it had been authorized by Mr. Leverenz putting his initials and his "O.K." on the drafts; that the two drafts that were paid were included in the monthly statement of cancelled checks and mailed to Mr. Leverenz. Mr. Leverenz claimed, however, that he had not initialed them nor had he received the cancelled drafts from the bank and did not know where they were. So far as the record discloses neither party pursued this matter further.

Leverenz testified further that on or about the 10th day of June 1951 a friend of his told him that attorney Winkjer of Williston wished to see him and that sometime thereafter he called at Winkjer's office and that he then learned that the Daniel drafts had not been paid.

We quote from the testimony:

"Q. How had you discovered that the Daniels had not cashed their drafts? A. Attorney Winkjer.

"Q. Well, going back further. How did you happen to go and see Attorney Winkjer? A. A friend of mine here in town came down to Epping there.

"Q. You recall who that friend was? A. Ralph Slaaten.

"Q. All right go ahead. A. And he told me that Dean had told him that if he sees me to tell me to drop in the office.

"Q. Did Mr. Slaaten state to you what Dean wanted to see you about? A. I had no idea.

"Q. Do you recall the approximate date that Mr. Slaaten told you that Dean Winkjer wanted to see you? A. No, I would say it was around the 10th of that month.

"Q. Of what month? A. June.

"Q. June? A. I would say so.

"Q. And subsequently when you came to Williston, did you see Mr. Winkjer? A. Not the first time that I was here.

"Q. About when did you see him? A. I don't remember the date.

"Q. Well, what occurred on this visit to Williston when you did see Mr. Winkjer? A. He told me about the deal, about the Daniels, and that—

"Q. What did he say and what did you say? A. He told me that they were ready to start a lis pendens action or stop this lease deal. And I asked him at that time not to. I says, 'That shouldn't be done'. As far as I was concerned I just wasn't in a—that I hadn't had a chance to do anything about it before.

"Q. That was the first notice that you had that the drafts were not paid, is that correct? A. Yes.

"Q. Now give the conversation as near as you can between you and Mr. Winkjer? A. Well, he told me that Daniel's had withdrawn their drafts or something to that effect, and that they planned on a lis pendens action.

"Q. A lis pendens action? A. Uh huh.

"Q. Did you note at that time what he meant by lis ·pendens action? A. No.

"Q. What else was said then? There must have been more conversation between you and he? A. I told him to hold it up for awhile if he could.

"Q. For what purpose? ·A. I wanted to see the Daniel's and talk it over with them. I still figured that we had a good chance to settle it, or at least wait until Mr. Hamilton got here.

"Q. Did you ask him to wait until Mr. ·Hamilton arrived? ·A. Yes.

"Q. Now following this visit at Mr. Winkjer's office, did you see Daniels? A. Yes. I saw Francis Daniel and Joe Daniel."

After his meeting with attorney Winkjer Leverenz contacted the plaintiffs and a meeting was had with them at Ray on Saturday evening July 14 at which time the plaintiffs J. H. Daniel and F. B. Daniel, and Hamilton and Leverenz were present. The payment of the drafts was discussed and arrangements were made to meet at the Williston bank on Monday morning July 16th. With reference to the meeting at Ray on July 14th Leverenz testified as follows:

"Q. Now do you recall the conversation that was held at that time? A. Parts of it, yes.

"Q. Will you state what was said by the various people in the presence of each other on that particular occasion? A. Well, the Daniels claimed they hadn't been getting their money, or hadn't been able to get their money. Mr. Hamilton and myself told them that the money was there. It should

have been paid. Mr. Hamilton promised them that we would be at the bank Monday morning to see that they did get their money.

"Q. And what did Mr. J. H. Daniel and Mr. Francis Daniel say at that time? ,A. As I remember they said they would be there."

Hamilton and Leverenz and J. H. Daniel and F. B. Daniel appeared at the bank Monday morning in accordance with the arrangements made the previous Saturday evening at Ray. They waited a few minutes for the bank to open and then they all went into the bank together. Leverenz stated that he talked to one of the personnel in the bank ·who he thought was Mr. Harding, vice president of the bank, and that he told him to pay the Daniel drafts. To this statement he said that Mr. Harding replied "O.K." Leverenz then left the bank. The plaintiffs, J. H. Daniel and F. B. Daniel, admitted that they heard Leverenz say to Mr. Harding, vice president of the bank, "Pay those drafts," and that Harding said "O.K." With reference to the meeting at Williston bank the plaintiff F. B. Daniel on cross-examination testified as follows:

"Q. You didn't talk about this deal with Mr. Leverenz and to Davidson, Jr., while you were there? A. Well, we did say briefly—

"Q. What did you say? A. Well, I asked him if he thought they were liable for not making our payments.

"Q. I see. And what did he say? A. He said 'No,' he didn't see where they were, because he said, 'We didn't have any authorization to pay, to make those payments.'

"Q. Well, you just heard at that time, two or three minutes before, Harry tell the vice-president, Mr. Harding, that those drafts were to be paid? A. That's true.

\*   \*   \*   \*   \*   \*

"Q. You thought if the bank was liable to be stuck, you would go through with the deal rather than have

that happen, I suppose. A. No, not stuck, if they were going to put the bank in trouble."

Upon the record thus made the trial court held that there was no evidence of fraud on the part of the defendants; but that there was a failure of consideration for the reason that the drafts issued in payment of the rentals were not paid within the time specified therein. Judgment was accordingly rendered quieting title in the plaintiffs in and to the premises described in the complaints, free and clear of any right, title or interest on the part of the defendants under the leases involved herein, and declaring said leases to be in all things cancelled, void and of no effect. The defendants appealed from the judgment and the whole thereof and demanded a trial de novo in this court.

The defendants assigned numerous errors, all of which may be considered under two propositions:

1. That the court erred in refusing to require plaintiffs to elect the form of action upon which they intended to rely, under the allegations in the complaints.

2. That the trial court erred in finding that the plaintiffs received no consideration for executing the oil, gas and mineral leases.

We will consider them in the order stated.

The substance of the amended complaints has been set out in this opinion. While these complaints are not in the best form, we nevertheless think that liberally construed they state a cause of action for determination of adverse claims. Actions to determine adverse claims may be employed for the purpose of cancelling oil, gas and mineral leases. In 24 Am.Jur. page 648, Gas and Oil, Sec. 163, we find the following:

"Actions to determine adverse claims are frequently resorted to in controversies concerning oil and gas leases. A duly recorded lease constitutes a cloud on the lessor's title, and where the lessee, under a lease that has expired by its own terms or has been validly forfeited, persists in his claim of right and refuses to execute or deliver a proper release for purposes of record, the lessor may appeal to a court of equity to quiet his title. But of course he must make a meritorious showing in order to obtain relief."

And in the case of Udgaard v. Schindler, 75 N.D. 625, 630, 31 N.W.2d 776, 779, it is held:

"We think it clear therefore that an action to determine adverse claims will lie to recover possession of real property from a lessee who holds over after the termination or forfeiture of his lease."

We hold that under the authorities cited, the trial court correctly denied the motion of the defendants made at the opening of the trial.

The second point for consideration is whether the court erred in holding that there was a failure of consideration.

It is conceded that the $10 payment specified as consideration for granting of the leases was not paid and may therefore be disregarded. The plaintiffs contend that the consideration for the execution and delivery of the leases was the payment of the rentals provided for therein and that the consideration failed for the reason that the drafts issued in payment thereof were not paid within fifteen days as provided for therein. The printed stipulation in the leases with reference to the time for rentals is as follows:

"If no well be commenced on said land on or before one year from the date hereof, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor or to the lessor's credit in the American State Bank at Williston, N.D., or its successors, * * * Six Hundred eighty and no/100 * * * Dollars."

However, the defendants issued drafts in payment of rentals. They were of the same date as the leases; they fixed the time of payment of the rentals. Under the stipulation contained in the drafts they were payable within fifteen days upon approval by the defendants of plaintiffs' title to the land. The drafts were not paid when presented to the bank for payment on May 11, 1951. They were not paid on May 31, 1951. Plaintiffs' cause of action accrued on May 11th when payment of their drafts was refused; but they did not notify the defendants and took no action. Thereafter and on Saturday July 14th, plaintiffs met with the defendants Hamilton and Leverenz at Ray, North Dakota, and negotiated with them with reference to payment of the drafts. Defendants advised them that sufficient funds to pay the drafts were then and at all times had been on deposit in the Williston bank, and that if they would meet the defendants at the bank on Monday morning July 16th payment would be made. Plaintiffs accordingly met with the defendants at the bank on Monday morning looking to the payment of the drafts and the undisputed testimony shows that defendants had funds on deposit in the drawee bank to pay plaintiffs' drafts; the bank was then and there directed by defendant Leverenz to pay the drafts in the presence of the plaintiffs who still had possession and control of the drafts, and had they been presented they would have been paid in full.

The rule governing rescission is prescribed by section 9–0904, NDRC 1943, and is as follows:

"Rules Governing Rescission. Rescission, when not effected by consent or pursuant to sections 9–0808 and 9–0809, can be accomplished only by the use, on the part of the party rescinding, of reasonable diligence to comply with the following rules:

"1. He must rescind promptly upon discovering the facts which entitle him to rescind, if he is free, from duress, menace, undue influence, or disability and is aware of his right to rescind; and

"2. He must restore to the other party everything of value which he has received from him under the contract or must offer to restore the same upon condition that such party shall do likewise, unless the latter is unable or positively refuses to do so."

Upon the state of the record before us the question presented is whether plaintiffs waived their right to rescind the leases by not acting promptly as required by subsection 1 of Section 9–0904, supra, after payment of their drafts was refused, and by their subsequent negotiations with the defendants relative to payment thereof.

■ "Where a party, with knowledge of facts entitled him to rescission of a contract or conveyance, afterward, without fraud or duress, ratified the same, he has no claim to the relief of cancellation. An express ratification is not required in order thus to defeat his remedy; any acts of recognition of the contract as subsisting or any conduct inconsistent with an intention of avoiding it, have the effect of an election to affirm. Indeed, it has been declared that since the remedy of rescission or cancellation is not held in high esteem by the courts even slight circumstances showing a purpose or intent to waive it will preclude the allowance of such relief. * * *

"Particular acts or attitudes on the part of plaintiff which, under the principles just outlined, would constitute an affirmance or ratification of a contract otherwise subject to judicial rescission are infinite in their variety; generally speaking, any transactions with defendant relating to the subject matter of the contract and inconsistent with an intention to rescind will preclude a rescission." 12 C.J.S. Cancellation of Instruments, § 38, pages 996 and 997.

And in 12 Am.Jur. page 865, Contracts, Sec. 310, it states:

"Even though there is no stipulation in the contract that time shall be essen-

tial nor anything in the nature or circumstances of the agreement to make it so, it can nevertheless be made so after the time for performance has arrived by a performance or tender of performance by one party and a demand of the other or by a demand by a party not in default who is ready to perform. Time may also be made of the essence by the act of one of the parties in fixing a reasonable time for the completion of the contract and giving notice to the other party of an intention to abandon it unless it is completed within the time fixed. This rule is especially applicable where there has been a waiver of the time stipulation in a contract. Time cannot again be made of the essence without notice to the party in default requiring performance within a reasonable time to be specified in the notice and stating that if there is not performance within this time the contract will be abrogated, or without conduct equivalent to such notice. This rule applies regardless of whether the time stipulation in the original contract was of the essence of that contract."

In the case of Crocker Chair Co. v. Edward Hines Hardwood & Hemlock Co., 201 Wis. 415, 230 N.W. 61, 64, 75 A.L.R. 603, the court had under consideration the question whether the defendant in that case had waived strict performance of a sixty-day net payment provided in the contract between the parties. There had been some discussion between the parties with reference to the sixty-day payment feature involved and with reference thereto the court said:

"Whether the result of that discussion amounted to an express agreement to waive compliance in this respect, the plaintiff had a right to believe that indulgences would be granted. At least, the plaintiff had a right to believe that it would be warned if the defendant intended to enforce the strict terms of the contract with respect to payment."

Upon the record and the evidence before us we conclude that the plaintiffs by their conduct as hereinbefore set forth waived their right to rescind and that they are only entitled to payment in full of their drafts.

The judgment of the district court is reversed and the defendants are entitled to a dismissal of the actions upon payment in full of the drafts in question.

It is so ordered.

MORRIS, C. J., and CHRISTIANSON, GRIMSON, and BURKE, JJ., concur.