GATE CITY SAVINGS AND LOAN AS-
SOCIATION, a corporation, Plain-
tiff/Appellee,

v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION, a corporation,
Defendant/Appellant,

Information Management Technology, Inc.,
a corporation, Defendant.

Civ. No. 8941.

Supreme Court of North Dakota.

Dec. 5, 1973.

---

Nilles, Hansen, Selbo, Magill & Davies, Fargo, for defendant-appellant.

Pancratz, Wold & Johnson, Fargo, for plaintiff-appellee.

TEIGEN, Judge.

International Business Machines Corporation (hereinafter IBM) has appealed from a judgment in favor of Gate City Savings and Loan Association (hereinafter Gate City) and against IBM and Information Management Technology, Inc. (hereinafter IMT), jointly and severally, in the amount of $7,673.99, plus interest and costs. IMT permitted judgment to be entered against it by default and has not appealed.

The action involves a dispute over sales tax paid, resulting from the sale of certain computer equipment which IMT had on lease from IBM, which equipment was later purchased by Gate City. The computer equipment was installed and in operation under a lease agreement between IBM and IMT at a business location designated by IMT in Fargo, North Dakota. Gate City, also located in Fargo, was interested in acquiring additional computer equipment by purchase and the computer equipment in the possession of IMT was recommended by a representative of IBM as being proper equipment for Gate City to purchase. IMT apparently was also interested in terminating its lease agreement with IBM for this equipment. Because IMT had this equipment on lease it had earned certain "purchase credits" under an IBM lease policy, and Gate City was interested in obtaining the benefit of IMT's purchase credits· if it purchased the equipment.

Pursuant to IBM policy a "purchase credit" earned by a lessee was not transferable to a third person. Thus under this policy, Gate City could not purchase directly from IBM at the discounted price. It appears, however, that the three parties, Gate City, IMT and IBM, through their respective representatives, were all desirous of working out an arrangement whereby Gate City would become the ultimate owner of the computer equipment in the possession of IMT. However, IBM's policy on purchase credits stood in the way of Gate City making a direct purchase from IBM at the discount price.

Gate City was already the owner of considerable IBM equipment and also held some on lease. It was estimated that Gate City had purchased over a million dollars worth of equipment and that it was paying IBM, in addition to rentals, from $1500 to $2000 per month for maintenance of IBM equipment in its possession. However, Gate City was in need of this larger equipment in the possession of IMT.

A number of contacts were made between representatives of Gate City, IBM and IMT, which ultimately resulted in the instant transaction whereby Gate City acquired the computer equipment at the discount price.

The transaction was made in two steps. Gate City entered into a purchase contract with IMT, and IMT entered into a purchase contract with IBM. At this point a problem developed. Although Gate City, at that time, was exempt from paying sales tax on purchases of tangible personal property, a sale to IMT would constitute a taxable sale under the North Dakota Sales Tax Act. Therefore, when IBM billed IMT for the equipment it added the sales tax, which, upon a sale of $301,009 at the rate of 4%, amounted to $12,040.36. However, it appears that it was understood that if IMT could also qualify as being exempt from sales tax on this transaction, the sales tax would be refunded by IBM. IBM wrote a letter to IMT advising that IBM "will refund the sales tax to * * *

[IMT] upon receipt of a North Dakota Sales Tax Exemption Certificate showing your Sales Tax Permit Number, signature, and stating that this transaction qualifies for exemption because of resale of this equipment to Gate City Savings and Loan Association." Thereupon IMT, which had not been a retailer of tangible personal property, obtained from the State Tax Department a Retailers Sales and Use Tax Permit and thus qualified as a retailer. It forwarded the same to IBM, requesting a refund in the amount of $12,040.36 and, on April 24, 1970, IMT forwarded to IBM a "resale certificate" (Section 57–39.2–10(2), N.D.C.C.), signed by the president of IMT, describing the computer equipment purchased, and claimed exemption on the basis that the equipment was purchased for the purpose of resale. Upon receipt of these instruments by IBM from IMT, IBM issued a credit memorandum, crediting the amount of the sales tax of $12,040.36 to the open, unpaid account of IMT but refused to make restitution in cash.

Under the arrangement Gate City had made payment directly to IBM. Two checks were issued, both made payable to IBM. One was in the amount of the purchase price of $301,009, dated April 1, 1970. A representative of IBM refused to accept this check as it did not include the sales tax. Thus a second check, dated April 9, 1970, was drawn in the amount of the sales tax, to wit, $12,040.36, and delivery of both checks was made to an IBM representative and accepted by IBM. It appears that the regular retail sales price of the equipment was in the neighborhood of $350,000. Thus a substantial saving to Gate City was effected under this arrangement and IBM's policy was not technically violated.

It also appears that Gate City and IMT made a separate agreement, dated April 8, 1970, whereby IMT agreed to apply for a refund of the sales tax; that the amount refunded was to be divided between them, $7,090.36 to Gate City and the remainder to be retained by IMT for its part in the transaction.

In its finding number 7, the trial court found:

"Though the documents in the files of IBM referred to a sale from IBM to IMT and a subsequent resale to Gate City, Gate City was not a party to these arrangements and had no direct knowledge of them. In substance and fact, Gate City purchased the equipment from IBM and directly paid IBM for the equipment and for the sales tax payment required by IBM."

On the basis of its findings the trial court concluded:

"1. With respect to the sum of $12,040.36 paid by Gate City to IBM, IBM was under a fiduciary obligation to Gate City.

"2. Both Gate City and IMT were exempt from payment of sales tax with respect to the purchase of the equipment in question.

"3. IBM was not legally authorized to credit its existing account with IMT for the full amount of the sales tax payment made by Gate City.

"4. Gate City is entitled to judgment, jointly and severally, against IBM and IMT in the amount of $7,090.36, plus interest at 4% per annum from May 8, 1970, plus costs and disbursements."

It is the contention of IBM on this appeal that there was no contract between IBM and Gate City and that, therefore, IBM had no duty to refund the sales tax to Gate City. It points out that there were three separate and distinct contracts: (1) lease of the equipment between IBM and IMT, giving IMT an option to purchase at a bargain price, which option was not assignable or transferable; (2) purchase agreement between IBM and IMT, including an agreement to refund the sales tax to IMT if IMT qualified as being exempt;

and (3) purchase agreement between Gate City and IMT for the resale of the equipment and for the division between Gate City and IMT of any sales tax refund.

IBM argues that it could not refund the sales tax to Gate City because IBM would be in violation of its express contract with IMT if it did so. IBM argues that its knowledge that IMT was purchasing for resale to Gate City does not result in a contract or raise any duty or impose any liability between IBM and Gate City, and the mere fact that the checks in payment came from Gate City to IBM does not give rise to a contract or promise of any kind. It also argues that Gate City was a mere incidental beneficiary and, as such, could not maintain an action against IBM. It argues that Gate City is a "mere stranger" to the agreement for IBM to refund the sales tax; that there is no contract, no privity, and no duty; and that Gate City contracted with IMT and assumed the risk of IMT's continued solvency in the same way as IBM, who still holds an unpaid accounts receivable against IMT, assumes the risk. IBM argues that it is undisputed that IMT was · indebted to IBM in excess of the amount of the tax rebate and that there is nothing in the record to indicate that IMT in any way disagrees with the procedure followed by IBM. It argues further that set-off is a recognized right in North Dakota, being specifically permitted by statute.

The trial judge, in his oral ruling from the bench upon which the findings of fact and conclusions of law are based, found that IBM had knowledge that Gate City had an interest in the sales tax, and that on the basis of equity and fairness IBM should not be permitted to appropriate this money and apply it to an account which Gate City did not owe nor have an interest in. Coupled with this fact, the trial court concluded that if this were permitted to happen, there would be, in the court's opinion, "an unjust enrichment on behalf of IBM."

In its bench ruling the trial court has separated the transaction into two phases: (1) the purchase of the equipment; and (2) the payment of the sales tax. It found that the sales tax was placed in the hands of IBM for a specific, restricted purpose and that IBM had no authority to appropriate it to anyone else's use. Therefore the appropriation by IBM for a nonauthorized purpose by crediting the unpaid account of IMT was not binding on Gate City.

Thus it appears that the trial court found a quasi contractual liability for unjust enrichment based upon the ground that IBM received a benefit which was unjust for it to retain, and that it ought to make restitution to Gate City, the party entitled thereto.

■ Contracts may be express or implied. Section 9–06–01, N.D.C.C., defining contracts, states:

"A contract is either express or implied. An express contract is one the terms of which are stated in words. An implied contract is one the existence and terms of which are manifested by conduct."

■ Implied contracts are divisible into two classes: contracts implied in fact and contracts implied in law, more properly designated as quasi or constructive contracts. 17 C.J.S. Contracts, § 4; 17 Am. Jur.2d Contracts, § 3.

■ In paragraph 4 of the syllabus of Stark County v. State, 160 N.W.2d 101 (N.D.1968), we held:

"A quasi contract arises where a transaction between parties gives them mutual rights or obligations, but does not involve an express agreement between them. Receipt of benefits, which it would be inequitable to retain without paying therefor, constitutes the essence of quasi-contractual obligations."

■ The legal principles stated in the above holding are more fully expressed in

the following quotations from Corpus Juris Secondum and American Jurisprudence:

"Contracts implied in law, or, as stated supra § 4, more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice, and which are allowed to be enforced by an action ex contractu. They rest solely on legal fiction and are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of contract for the purpose of the remedy, and the obligation arises not from consent, as in the case of true contracts, but from the law or natural equity. The courts employ the fiction of quasi or constructive contract with caution.

"While the right to recover on the theory of quasi contract is governed by principles of equity, the remedy is governed by the law, much as though an actual contract had been established; that is, quasi contracts are legal obligations rather than equitable in the sense that they originated in courts of law and are enforced by so-called legal as distinguished from equitable remedies. Rights quasi ex contractu are in personam and are enforced by actions in personam. A 'quasi-contractual obligation' and a 'constructive trust' closely resemble each other, the chief difference being that plaintiff in bringing an action to enforce a contractual obligation seeks to obtain a judgment imposing a merely personal liability on defendant to pay a sum of money, whereas in a suit to enforce a constructive trust plaintiff seeks to recover specific property.

"Generally, quasi or constructive contracts rest on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatsoever it is certain that a man ought to do, that

the law supposes him to have promised to do. The obligation to do justice rests on all persons, and if one obtains money or property of others without authority, the law, independently of express contract, will compel restitution of compensation.

"In this respect, the terms 'restitution' and 'unjust enrichment' are modern designations for the older doctrine of quasi contracts, and the substance of an action for 'unjust enrichment' lies in a promise, implied by law, that one will restore to the person entitled thereto that which in equity and good conscience belongs to him. Quasi-contractual obligations may be imposed despite, and frequently in frustration of, the intention of the parties, and no promise of repayment need be shown. So, when the party to be bound is under a legal obligation to perform the duty from which his promise is inferred, the law may infer a promise even as against his intention. Also, want or privity between parties is no obstacle to recovery under quasi contract, and incapacity to enter into a contract is not in itself a defense to an action for restitution.

"The essential elements of quasi contract are a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof. In other words, the receipt of a benefit, inequitable to retain, is the essence of quasi-contractual obligation, no cause of action can lie in quasi contract against one not shown to have been enriched wrongfully at plaintiff's expense, and the mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor. The person receiving the benefit is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between

the two persons, it is unjust for him to retain it." 17 C.J.S. Contracts, § 6.

"A quasi-contract has no reference to the intentions or expressions of the parties. The obligation is imposed despite, and frequently in frustration of, their intention. For a quasi-contract neither promise nor privity, real or imagined, is necessary. In quasi-contracts the obligation arises, not from consent of the parties as in the case of contracts express or implied in fact, but from the law of natural immutable justice and equity. Where a case shows that it is the duty of the defendant to pay, the law imputes to him a promise to fulfil that obligation. The duty, which thus forms the foundation of a quasi-contractual obligation, is frequently based on the doctrine of unjust enrichment." 66 Am.Jur.2d, Restitution and Implied Contracts, § 2.

■ In consideration of the circumstances as disclosed by the record here we conclude that the trial court was correct in holding that the transfer of the sales tax money by Gate City to IBM created a quasi contract under which IBM was required to make restitution to Gate City of that portion of the sales tax money due it under its agreement with IMT.

■ Next, IBM specifies that the trial court erred when it referred to a pretrial deposition filed in the case which had not been offered or received as evidence at the trial. In the oral memorandum decision given from the bench, the trial judge read from a portion of the deposition. The subject matter read related to the price of the equipment in question. It did not pertain to the sales tax issue. Further, testimony was adduced at the trial relative to the sale price, both with and without the purchase credits. The testimony which the trial judge read as he dictated the memorandum decision was not essential to the decision. Although we find it was error for the trial court to refer to testimony not of record in the trial, we find that the error was without prejudice and therefore not a ground for reversal as it was not so essential that the trial court's findings could not have been made without it. George v. Odenthal, 58 N.D. 209, 225 N.W. 323 (1929). See Rule 61, N.D.R.Civ.P.

Lastly, IBM complains that the trial court erred in its order on appeal from the clerk's retaxation of costs in allowing, as a taxable cost against IBM, the publication fee of the summons because IBM had been personally served and the publication was made for the purpose of obtaining service on IMT. The judgment is against IMT and IBM jointly, and includes the costs on retaxation against both defendants jointly. In its order assessing as a taxable cost the publication fee of $13.94, the trial court found that IMT "was a necessary and joint party to this action."

■ Section 28–26–07, N.D.C.C., provides that costs shall be allowed the plaintiff in an action for the recovery of money when the plaintiff shall recover $50.00. Section 28–26–06, N.D.C.C., provides that certain disbursements must be taxed by the clerk in actions, including the legal fees for publication when publication is made pursuant to law. There is no claim that publication of the summons was not made pursuant to law. The only claim made is that the disbursement for publication should not be taxed against the joint defendant, IBM. No case law has been cited to us on this issue and we have found only one case. In Liter v. Green, 2 Wheat (U. S.) 306, 4 L.Ed. 246, the Supreme Court of the United States held that a joint judgment against tenants for costs, as well as the land, was correct. We follow this reasoning and affirm the trial court's order.

The judgment is affirmed.

ERICKSTAD, C. J., and KNUDSON, PAULSON and VOGEL, JJ., concur.