Jester D. BECK and Sharon K. Beck,
Plaintiffs, Appellants,

v.

Willie LIND, Defendant, Appellee.

No. 9065.

Supreme Court of North Dakota.

Oct. 31, 1975.

242

Freed, Dynes, Malloy & Reichert, Dickinson, for plaintiffs, appellants; argued by George T. Dynes.

Greenwood, Moench & Galloway, Dickinson, for defendant, appellee; argued by L. E. Greenwood, Dickinson.

SAND, Judge.

This is an appeal by plaintiff Beck from the judgment of the district court of Dunn County and from the denial of his motion for a new trial.

Beck had leased his ranchland to Lind April 1, 1970, for a period of five years. Disputes later arose over this lease and other interrelated activities between Beck and Lind, which culminated in Beck initiating legal action against defendant Lind.

In September of 1973, Beck brought an action for breach of contract, for cancellation of the remaining term of the lease, for additional rents due for damages caused by the additional cattle, and for other amounts due him which arose out of the interrelated activities during the period of time involved.

The action was tried to the court without a jury. The court's judgment terminated the lease as of April 1, 1974, but disallowed any rents due on the terminated lease and

allowed only a portion of the damages claimed by Beck on the related activities. Beck made a motion for a new trial, which was denied. The appeals followed. Beck contends that the trial court made numerous errors. We will refer to, identify, and discuss those which are essential to the disposition of this appeal.

We reverse in part and remand in part for a new trial.

The errors raised before this court are substantially the same as those upon which Beck relied for his motion for a new trial. A noteworthy majority of the disputes arose out of the five-year lease, either in whole or in part, or relate directly or indirectly to it.

In the basic transaction, Beck leased 1,920 acres of land to Lind for a period of five years, beginning April 1, 1970, at the rate of $11,500 per year, of which the sum of $5,750 was due and payable on the 1st of August of each year, and the sum of $5,750 due and payable on the 1st day of January of each year.

The lease included 480 acres of land that Beck had leased from the State of North Dakota, which contained a prohibition against subleasing without consent of the State of North Dakota. The lease provided that upon Lind's failure to fulfill the covenants of the lease Beck could re-enter without "working a failure of the rents to be paid." The lease limited Lind to 130 head of cows except during the period between November 15 and April 1 of each year. A Quonset and home located on the premises were reserved to Beck, but Lind could use the other buildings as needed. Four cattle "brands" were leased to Lind for the same period. Pursuant to the lease, Lind agreed to surrender the leased premises at the end of the five years in as good a condition and repair as when he took them, wear and tear and damage by elements alone excepted. Failure to make payments as stated in the agreement constituted grounds for breach of the lease agreement. The lease also contained a provision that in the event the governmental feed grain and wheat certificate programs are discontinued Lind shall reimburse Beck for the loss of revenue up to but not exceeding the sum of $2,500 per year, and that sum shall be payable at the times and in the manner as the lease payments.

The trial court terminated and canceled the lease as of April 1, 1974. The total amount due from the start of the lease on April 1, 1970, to the date of its termination by the court, April 1, 1974, was $46,000. The trial court also held that plaintiff was not entitled to any rent from April 1, 1974, to April 1, 1975. The trial court found that the sum of $48,566 had been paid to Beck as of June 15, 1973, by Lind, ostensibly for the leased land. But Lind admitted that $2,000 of this amount was for rent for a separate parcel of land, which reduced the amount of payments to $46,566. The trial court held that the defendant Lind had fulfilled his financial obligation under the lease and was entitled to a credit of $566 for the overpayment.

Beck, however, claims that substantial portions of the payments for rent and pasture were not for rent, but were for wages. At the trial, Beck claimed that his employment with Lind extended from April 1, 1970, to December 31, 1971, at the rate of $100 per week, amounting to $9,100,[1] which should be deducted from the $46,566. Beck also claims that the sum of $1,546.78 should be deducted from the $46,566, as such amount represents payments due under the lease whereby Lind agreed to make up the difference whenever payments under the government program in which Beck was enrolled failed to reach $2,500 per year. Beck further claims that the additional sum of $1,499.70 is due him under the government deficiency contract clause for the year 1973. The trial court denied all claims for deficiency payments.

Because this case involves numerous claims relating to alleged erroneous rulings

1. This amount represents wages, rather than rental payments, according to Beck.

on the admission of evidence, we deem it appropriate to call attention to what this Court said in *Schuh v. Allery*, 210 N.W.2d 96, 99 (N.D.1973), and which was repeated in *Signal Drilling Co. v. Liberty Petroleum Company*, 226 N.W.2d 148 (N.D.1975) and *Matson v. Matson*, 226 N.W.2d 659 (N.D. 1975):

"We believe that a trial judge, in a nonjury case, should ordinarily admit all evidence which is not clearly inadmissible. A judge who is competent to rule upon the admissibility of evidence can distinguish in his own mind, when deliberating his ultimate decision, between evidence which is admissible and evidence which is not admissible. The introduction of allegedly inadmissible evidence in a nonjury case will rarely be reversible error, and it may often avoid a possible reversal in cases where this court, on appeal, holds that the evidence is admissible."

As to the employment, Beck claims that he was paid by check for the employment, but that the checks were labeled "for pasture," "for rent," or "for pasture and rent." Beck claims that this arrangement was proposed by Lind so that both the employer and employee were not required to make contributions to Social Security.

The trial court in deliberating this question, as evidenced by the memorandum opinion, gave great weight to the rule of law that the court will not aid either party nor enforce any illegal agreement, but will leave the parties where it finds them, especially where the parties are in pari delicto. The trial court applied the rule announced in *Janzen v. Crum*, 50 N.D. 544, 197 N.W. 138 (1924), and *Krueger v. City of Hatton*, 75 N.D. 489, 28 N.W.2d 749 (1947).

The trial court in its memorandum opinion stated:

"But even if the court believed, found and determined that the plaintiff's version of the facts with respect to his employment by the defendant from 4–1–70 to 12–22–71 were true, which it does not, such belief, finding, or determination would be of no avail to the plaintiff in this case for two decisive reasons."

The trial court then referred to the principles of law found in *Janzen v. Crum, supra,* and *Krueger v. City of Hatton, supra.*

The trial court also said:

"But assuming, without conceding, that the court should believe, find and conclude that the version of the facts testified to by the plaintiffs on this issue are true and correct it would be of no avail to the plaintiffs because of the principle of law decided in the above cases."

We believe that the trial court misapplied or applied too broadly the principle of law stated in the above-cited cases.

■ A contract of employment for performing lawful personal service is per se not illegal. Therefore, if a contract or agreement for lawful personal services was entered into between Beck and Lind the contract or agreement would be valid. The question of illegality arises from the method and manner of payment as distinguished from the basic contract for personal services. We, of course, recognize that before the question of the method of payment can be considered it must first be determined that a contract for personal services, in fact, existed.

We agree with the basic principles of law announced in *Crum, supra.* However, we do not believe they have application here or should be applied so as to miscarry justice.

The Supreme Court of Wisconsin, as early as 1898, in *Crowns v. Forest Land Company*, 99 Wis. 103, 74 N.W. 546, said, in a case involving a note and mortgage given for purposes of evading taxation:

"When the revenue laws provide ample punishment for the evasion by taxpayers of their just dues, it would seem a monstrous injustice to permit a mortgagor to defeat the payment of his debt by bringing any such issue into a suit brought to foreclose his mortgage. The alleged turpitude of the mortgagee furnishes no

ground for a discharge of the mortgagor from the payment of his just debt."

■ The internal revenue laws provide ample punishment for the evasion of taxes or contributions. A rule of law in any event should not be applied so as to benefit the principal perpetrator of the violation. See Section 31–11–05, subsections 8 and 15, N.D.C.C. In making this observation we are not suggesting or making an implied finding that an employment contract existed. This is a matter to be ultimately resolved by the trier of facts.

■ In this case, Beck was not attempting to enforce his alleged contract for personal services. He intended to use the method of payment under the alleged employment contract as evidence to show that Lind was still indebted to him for lease payments and particularly that certain payments in form of checks which were labeled "pasture rent" in the total amount of $9,100 were in reality payments for personal services and not for any rental of land whatsoever. Beck attempted to prove an oral executed contract as evidence, but not for the purpose of enforcing any provision of the alleged employment contract. Thus it is in this respect basically a question of fact to be governed by the rules of evidence, particularly as to the amount of evidence needed to establish the existence of an oral contract.

In an effort to show that Lind had employed another person under the same scheme and arrangement, Beck called Nichols to testify that he (Nichols) had such an arrangement with Lind. Under objection by Lind, the testimony of Nichols was ruled inadmissible by the trial court. Beck, in his offer of proof, showed that Nichols was employed by Lind during the period from 1970 to 1972, that Nichols was working under an arrangement whereby the employer-employee relationship was not reported for Social Security and income tax purposes, and that it was the same arrangement under which Beck claimed he was working for Lind. Nichols offered testimo-

ny also that showed that during the period that he worked for Lind taking care of the cattle on the leased land, he worked with Beck on the leased land, that they were the only two working on the ranch, and that they performed the same tasks.

■ The commission of an act can be proved by showing acts of a similar nature by the same person if the acts are connected in some special way indicating a relevancy beyond mere similarity as to some particulars. See Curns v. Martin, 193 N.W.2d 214 (N.D.1971). The test whether proper evidence is irrelevant is whether it would reasonably and actually tend to prove or disprove any matter of fact in issue. See Hogan v. Knoop, 191 N.W.2d 263 (N.D. 1971); Bale v. Brudevig, 77 N.D. 494, 43 N.W.2d 753 (1950).

■ It is the object of the court in exercise of its appellate jurisdiction to assure ultimate justice as far as possible. Haaland v. Verendrye Electric Cooperative, 66 N.W.2d 902 (N.D.1954).

■■ Generally, the testimony of another person as to the circumstances of his employment would not be relevant to establish your own employment. However, where the facts, conditions, circumstances, and the similarities are comparable to the employment relationship intended to be proven, the testimony should be admitted.

"'An issue as to the existence or occurrence of a particular fact, condition, or event, may be proved by evidence as to the existence or occurrence of similar facts, conditions, or events, under the same, or substantially similar, circumstances.' 32 C.J.S., Evidence, § 584, p. 438." Ellis v. Union Pacific Ry. Co., 148 Neb. 515, 27 N.W.2d 921 (1947).

■ The proposed testimony of Nichols had probative value and should have been admitted. The trial court committed error in denying the admission of such testimony.

As to the deficiency payments, the trial court found that Beck had failed to prove

that any deficiencies arose by reason of the discontinuance of any federal programs covered by the lease and that he was not entitled to recover anything. The trial court interpreted the contract to mean that Beck would be entitled to nothing from Lind unless the government programs were discontinued, rather than merely reduced, during the term of the lease.

The pertinent language of the lease pertaining to this question is as follows:

"IT IS FURTHER AGREED That all governmental payments made in connection with the operation of said real estate relating to governmental feed grain and wheat certificate programs, soil conservation and other programs shall be payable to the said First Parties. It is further agreed that in the event the governmental feed grain and wheat certificate programs are discontinued the Second Party shall reimburse the First Parties for their loss of revenue up to but not exceeding the sum of Two Thousand Five Hundred Dollars ($2,500.00) per year and that said sum shall be payable at the times and in the manner as the lease payments."

This provision, taken as a whole, is subject to construction and is ambiguous as to whether it means that the payments have to be totally discontinued or whether partial discontinuance requires the payment of those payments which have been discontinued or reduced. The last portion strongly suggests a guaranteed amount, with lessee paying the deficiency.

Beck attempted to show, through the pleadings and by testimony, that the parties understood the language of the lease to mean smaller, reduced or partially discontinued payments, rather than discontinued totally, and in fact had acted accordingly.

In an amended answer, Lind admitted that he had been making deficiency payments in accordance with Beck's interpretation of the contract.

Lind, in his second amended answer to the first cause of action in the second amended complaint, stated, under paragraph IV, that the second amended complaint had changed the figures, but specifically answered as follows:

". . . and that the Defendant has paid all sums that he has been informed are due to the deficiency of Government payments, and that if the Plaintiff can establish that there are additional sums due that he did not inform the Defendant of, that Defendant is willing to pay said sums as per the agreement."

The complaint and answer formulate the issues of an action and as such may constitute admissions which will stand unless satisfactorily explained to the contrary through testimony by one of the parties. See *Gallagher v. Haffner*, 77 N.D. 570, 44 N.W.2d 491 (1950). See also its limited application as stated in *Stockmen's Insurance Agency, Inc. v. Guarantee Reserve Life Insurance Co.*, 217 N.W.2d 455 (N.D. 1974). The effects of the answer should have been considered by the court in conjunction with the deposition, which, we will point out later, should have been permitted to be used as substantive evidence, as well as the testimony of the defendant Lind.

At the trial Lind, as a witness, was asked if he made any payments under the provision in question. Lind claimed he could not remember. Beck then attempted to use a deposition in which Lind had admitted making payments on that feature of the lease. The trial court, however, held that the deposition could not be used for impeachment purposes or for any other purposes because Lind said he didn't know if he had made that statement.

Rule 32(a), North Dakota Rules of Civil Procedure, provides, in part, as follows:

"(a) Use of depositions. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of

the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

"(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness."

This rule was obviously designed to combat faulty memory, exaggerations, understatements, false claims or defenses, and we can think of no logical reason or justification to develop a rule which would abrogate, limit, or curtail its application so as not to accomplish such basic purposes or designs.

A witness not being able to recall what he recently stated in a deposition is, in effect, indirectly contradicting that which he stated in the deposition. This then clearly brings it within one of the uses of the deposition as provided for in Rule 32.

■ On the question whether or not a deposition may be used to impeach a witness, this court in *State v. Igoe,* in 1973, 206 N.W.2d 291, 297, after discussing the Federal Proposed Rules of Evidence, and specifically Rule 801, concluded by saying:

". . . we hold that a prior statement of declarant which is inconsistent with testimony of the declarant at the trial, the declarant being subject to cross-examination concerning the statement, is admissible as substantive evidence of the truth of the matter asserted in the statement."

■ The advisory committee's notes as to the admissibility of the evidence stated:

"Prior inconsistent statements traditionally have been admissible to impeach but not as substantive evidence. Under the rule they are substantive evidence."

The conclusion reached by this court in *State v. Igoe, supra,* was in a criminal case. There is no reason why it should not apply in a civil case. We conclude that the deposition should have been permitted to be used to impeach Beck and as substantive evidence. We would further note that the court in 1973 adopted Rule 801 even before it was approved by Congress. Rule 801 as approved by Congress contains changes which are not significant to this case. In any case, the statement in the deposition would be admissible as an admission by a party opponent. Rule 801(d)(2).

■ This court in *Battagler v. Dickson,* 76 N.D. 641, 38 N.W.2d 720 (1949), said if the language of a contract is ambiguous the subsequent acts of the parties performed after entering into the contract pursuant to the contract may be helpful in determining the intentions of the parties and the construction placed on the language by the parties. This rule has application here.

We conclude that it was error for the trial court to deny the use of the deposition.

■ Beck also claims that Lind, by overgrazing, damaged the 480 acres of State land which he (Beck) initially leased from the State and later sublet to Lind. The trial court, however, denied any recovery on the basis that Beck was not the real party in interest and because the lease from the State contained a provision that it was not to be sublet without consent of the State.

The damages to the State land were not of a permanent nature and, according to the testimony, the land could be restored within the remaining period of Beck's lease from the State. Thus the damages suffered would be sustained by Beck rather than the State. The damage to the leasehold resulted in the land or pasture being unable to accommodate the usual number of cattle, but limited it to a smaller amount of cattle for grazing purposes. Thus the damage is for the loss of the use of the property and such damage is the value of such loss to the leaseholder.

The rule of law relating to the holder of a lease to recover damages is stated in *Schmeet v. Schumacher,* 137 N.W.2d 789 (N.D.1965). In *Schmeet* the plaintiff leased pastureland from the State. A fire damaged the land, which made the pasture use-

less for that year. Plaintiff was allowed to recover for the loss of the use of the pasture as a result of the wrongful burning by the defendant. In this case the damage was caused by overgrazing instead of a fire. Beck should have been allowed to recover the damages sustained. It was error for the trial court to deny damages to Beck.

Beck claimed that Lind used 1,000 bushels of oats worth $500. The trial court found that Lind had used 600 bushels and awarded Beck $300. Evidence was received that Beck had two 500-bushel bins filled to capacity with oats which equaled 1,000 bushels, and the oats were worth 50 cents a bushel. Lind denied using any of the oats. There was no evidence of any in-between figure or any amount used other than the 1,000 bushels.

 Under Rule 52(a), North Dakota Rules of Civil Procedure, the findings of the trial court are not set aside unless they are clearly erroneous. The facts are not clearly erroneous if there is substantial evidence to support the finding. In this instance we conclude there was no evidence to support the findings and, therefore, the findings of the trial court in this respect were clearly erroneous.

Beck claimed damages from Lind for Lind's wrongful use of the Quonset. The lease agreement provided that the Quonset was reserved to Beck. The evidence clearly established that Lind stored grain, and some farm machinery and equipment, in the Quonset for a period of 38 months. Beck claims this was without specific authority and without his permission or consent to do so. Beck claims the rental value of the Quonset was worth $50 a month, or a total of $1,900 for 38 months. Lind does not deny using the Quonset, but claims Beck told him he didn't need the whole building for storage purposes and that Lind could use the rest of it whenever he needed it for storage purposes.

The trial court found and held that Beck was estopped from claiming any rent because he had been standing by for a period of 38 months with actual knowledge and notice of the fact that Lind was using part of the Quonset for storage without complaining or objecting, or without billing or putting Lind on notice that he was expected to pay rental for partial use of the Quonset.

 The North Dakota Legislature adopted Section 31–11–06, N.D.C.C., thereby enacting into substantive law the equitable principle of estoppel and rendering it cognizable in both law and equity. *Neset v. Rudman,* 74 N.W.2d 826 (N.D.1956).

This Court, in *Grand Forks County v. City of Grand Forks,* 123 N.W.2d 42 (N.D. 1963), had under consideration the doctrine of estoppel and concluded that the doctrine is based upon misleading conduct or language of one party and relied upon by the other party to the other party's prejudice, and is applied against the party responsible for the misleading conduct or language. The *Grand Forks* case involved housing city prisoners in the county jail over a period of time. The City claimed because the County did not bill the City for a long period of time it was estopped from collecting any charges due. The Court said:

> "Surely it cannot be argued in this case that the City was in any way misled by the conduct of the County in accepting the city prisoners. The failure of the County to bill the City for maintenance of its prisoners for a long period of time did not in any way prejudice the City. We do not believe the County is estopped from asserting its claim."

 An essential element of equitable estoppel is a representation which may consist of words, acts, or silence, believed and relied upon by the party claiming the benefit of the estoppel which induced him to act or refrain from acting, to his prejudice. *Rath v. Armour and Company,* 136 N.W.2d 142 (N.D.1965); *Werner v. Werner,* 74 N.D. 565, 23 N.W.2d 757 (1946).

 In the instant case, there was no evidence that Lind was prejudiced, damaged, or misled by Beck's conduct. Thus

the conclusion of law and holding by the trial judge that Beck is estopped from asking for or collecting payment for the use of the Quonset was error.

Beck also claims that Lind is liable to him for grazing additional heads of cattle on the leased land (pasture).

Under the terms of the lease Lind was permitted to run 130 head of cattle on the land between April 1 and November 15 of each year. Plaintiff claims that in 1971 Lind ran 50 extra head for a seven and one-half month period between April 1 and November 15; in 1972, Lind ran 90 extra head for a six and one-half month period and 150 extra head for one month; and in 1973 Lind ran 150 extra head for two and one-half months, and 110 extra head for five months. Plaintiff claims that the fair rental for these extra cattle is $10,450 and asks the court to find defendant liable in implied or quasi contract.

The trial court held that plaintiff was not entitled to damages for the period of overgrazing prior to August 1, 1973,[2] because plaintiff's actions constituted a waiver, but as to any overgrazing after that date plaintiff was entitled to the sum of $2,117.50. The theory of the trial court was that plaintiff by action or by non-action had waived the breach of the lease limiting the number of cattle on the land to 130 up to that date and, therefore, was not entitled to damages. However, plaintiff argues that his suit is not for damages for breach of contract but is for recovery under a separate implied contract requiring defendant to pay extra rental for the additional cattle he put on the land.

An implied contract is one the existence and terms of which are manifested by conduct rather than words. Section 9–06–01, N.D.C.C.

Implied contracts are divisible into two classes: contracts implied in fact, and contracts implied in law, more properly designated as quasi or constructive contracts. 17 C.J.S. *Contracts* § 4; 17 Am.Jur.2d *Contracts* § 3.

■■■ Contracts implied in fact are based on the mutual intentions of the parties. The court must determine from the surrounding facts and circumstances whether the parties actually intended to enter into a contract. *Bismarck Hospital Association v. Burleigh County*, 146 N.W.2d 887 (N.D. 1966).

The facts in this case do not show that there was any intention to enter into a contract. Plaintiff made no objection to Lind's use of his land, never asked for more rent, and continued to accept the rent given to him as fulfillment of Lind's obligations. There was no suggestion by either party that any extra compensation was to be paid.

■■■ A quasi contract, implied in law, arises where a transaction between parties gives them mutual rights or obligations, but does not involve an express agreement between them. Receipt of benefits, which it would be inequitable to retain without paying therefor, constitutes the essence of quasi-contractual obligations. *Gate City Savings and Loan Association v. International Business Machines Corporation*, 213 N.W.2d 888 (N.D.1973); *Stark County v. State*, 160 N.W.2d 101 (N.D.1968). The legal principles of quasi contracts are stated in the following quotations:

" 'Generally, quasi or constructive contracts rest on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatsoever it is certain that a man ought to do, that the law supposes him to have promised to do.

" ' . . . In other words, the receipt of a benefit, inequitable to retain, is the

---

**2.** This is the date up to which the trial court found that Lind had paid rent to Beck after Beck had knowledge of the overgrazing. This date is subject to change depending on the findings by the trial court in a new trial as to the employment relationship contended by Beck.

essence of quasi-contractual obligation, no cause of action can lie in quasi contract against one not shown to have been enriched wrongfully at plaintiff's expense, and the mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor.'" *Gate City Savings & Loan Association v. International Business Machines Corp.*, 213 N.W.2d 888, 893.

 Cancellation and rescission are not compatible with implied quasi or constructive contract theories of law. The plaintiff cannot in one instance claim that the written contract was enlarged by an oral executed contract and at the same time claim that the acts constituted a violation of the written contract. Thus, the trial court's denying plaintiff recovery based upon implied or quasi contract was not error. This, however, is not dispositive of the issue on damages.

At the trial and on appeal, Lind contended that any rights Beck had for rescission or cancellation of the lease or for damages were waived. The trial court, in effect, concluded that Beck had waived certain rights up to a certain date.

 A waiver is a voluntary and intentional relinquishment or abandonment of a known existing right, advantage, benefit, claim or privilege, which, except for such waiver, the party would have enjoyed. *Gajewski v. Bratcher*, 221 N.W.2d 614 (N.D. 1974); *Gipson v. First National Bank of Bismarck*, 97 N.W.2d 671 (N.D.1959).

 To constitute a waiver there must be an intention to relinquish a known right, an intentional forbearance to enforce a right. *Jacobson v. Mutual Benefit Health & Accident Assn.*, 70 N.D. 566, 296 N.W. 545 (1941).

There is no question that Lind ran more cattle on the leased land in 1971, 1972, and 1973 than the lease allowed. Beck made no objection to this breach until 1973. Beck was aware of the number of cattle on the land, and helped in taking care of them. Beck continued to accept rent over this period and covering a period of time to August 1, 1973.[3]

This court, in *Udgaard v. Schindler*, 75 N.D. 625, 31 N.W.2d 776, 782 (1948), with reference to the question of waiver, said:

"She must have known what was taking place, yet she made no objections and offered no suggestions. Months later in the fall of 1946 during all of which time she dealt with defendants as her tenants, she claimed a breach of the conditions of the lease. The claim came too late. If defendants' acts did constitute a breach, plaintiff had waived the right to forfeiture. There was a clear recognition of the continuation of the tenancy after plaintiff had knowledge of the alleged breach. Such recognition is a waiver of a right to forfeiture. 32 Am.Jur. (Landlords & Tenants Sec. 882) 747; 35 C.J. (Landlord & Tenant Sec. 254) 1079; 51 C.J.S., Landlord and Tenant, § 117; *Hanson v. Hanson Hardware Co.*, 23 N.D. 169, 135 N.W. 766."

North Dakota, by statute, has adopted certain maxims of law as an aid to interpretation of its statutes, including, amongst others, the following: Section 31–11–05(6), "He who consents to an act is not wronged by it."

Beck claims that the reason he never objected to Lind's overgrazing was that he was employed by Lind at this time and did not want to jeopardize this relationship. Beck also stated that he believed the lease was a good deal and did not want it ended at that time.

"Although intent is necessary to effect a waiver of a breach of contract, it need not be shown by direct evidence; but if it appears to exist so as to mislead the

---

**3.** This date is subject to change depending on the findings relative to the employment contended by Beck.

**252**

adversary, it works an estoppel. The waiver of a breach of contract may be shown by an act which is so inconsistent with an intent to enforce the right which arises upon the breach as reasonably to induce a belief that the right has been relinquished. The acceptance of the benefit under a contract with knowledge of a breach thereof ordinarily constitutes a waiver of the wrong." 17 Am.Jur.2d *Contracts* § 447, page 908.

 The trial court held and concluded that Beck waived any right he had to the cancellation of the lease. The trial court further concluded that once having waived such right it cannot be regained for such purposes. We cannot state as a matter of law under these circumstances that the trial court erred in this conclusion and holding. Neither do we believe that the trial court erred by cancelling the lease as of April 1, 1974, on the basis that the relationship of the parties had so deteriorated as to make any continuation hopeless and useless.

 As to the damages for overgrazing (involving both State and other lands) and the question of whether or not Beck waived his right to such damages, we believe these issues in their entirety should be retried because the trial court placed undue emphasis on future weather conditions and, in addition, other major issues are being remanded for retrial and any findings of fact resulting therefrom could have a direct bearing on these interrelated issues and could produce different findings of fact. We believe the ends of justice will be better satisfied by remanding these issues for retrial even though there was some evidence to support the trial court's finding that Beck had waived his right to damages for overgrazing up to a certain day, namely August 1, 1973. These issues are accordingly remanded for new trial.

Upon retrial the parties should present to the trial court the specific principles of law upon which they will rely and which will be compatible with the evidence presented, and the trial court may demand that the parties do so.

The principles of waiver and estoppel apply only if certain essential facts are presented to support them.

We feel obligated to point out that on retrial the issue of employment as contended by Beck could have a material bearing on a number of items. Depending on the manner in which the employment issue is resolved it could determine the date up to which Beck had waived his right to damages if, in fact, he waived his right at all. We view this factual situation as so integrated that one may not be resolved without having a bearing on the other.

 Beck's claim for rent for the fifth year, relying on the language of the lease, was denied by the trial court. Under the circumstances, we do not view this as error. Forfeitures, as provided for in leases particularly as to future rent payments, are not looked upon favorably by the courts and are generally considered as a penalty. The penalty provision generally needs to be supported by actual damages to be sustained, rather than merely on the language of the lease itself. See 40 Am.Jur.2d, *Landlord & Tenant* § 559.

 There remains the question to be resolved on retrial relating to the damages sustained for overgrazing on both the State and other land. There does not appear to be one precise method or manner in which such damages may be established or measured. The before-and-after theory applies both to damages to real estate and damages to perennial crops on pastureland. See *Bolton v. Missouri-Kansas-Texas Railroad Company*, 373 S.W.2d 169 (Mo.App.1963); *Harke v. Ewald*, 51 N.D. 828, 200 N.W. 1009 (1924); *Thompson v. Chicago, B. & Q. R. Co.*, 84 Neb. 482, 121 N.W. 447 (1909); *Byrne v. Minneapolis & St. L. Ry. Co.*, 38 Minn. 212, 36 N.W. 339 (1888).

 The principles of law on damages as they may apply to meadows and pastures are briefly discussed in 25A C.J.S. *Damages* § 157, which states that any competent

evidence which would tend to shed light on the question is admissible.

 Testimony as to the number of cattle units the land in question (State and other) will be capable of grazing in 1975 would be material and would also be a method of determining what damages were sustained. It is recognized that weather conditions could have a bearing on pastures and grazing lands. But it does not necessarily follow that weather conditions should be considered in assessing damages. Because mortals are not in control of the weather, it would be appropriate to use an average year to determine the amount of cattle that may be grazed on the lands in question in 1975, taking into account that they were overgrazed in 1974, and, for that matter, possibly prior thereto.

Pertaining to natural agencies, 25 C.J.S. *Damages* § 20, p. 657, states the following:

"Natural phenomena of a usual and ordinary kind are not regarded as independent intervening agencies which will break the chain of causation between a wrongful act or omission and the ensuing loss. Of this character are ordinary winds or rains. Where, as a result of an act, the inevitable and immutable laws of nature are brought into play, thereby causing damage, the operation of these natural laws is not such an intervening independent act as will insulate the doer from the consequences of his act."

See also, 22 Am.Jur.2d *Damages* § 84, page 120.

On the basis of the foregoing, Beck is entitled to a new trial and this case is remanded for new trial on the following issues, unless the parties agree to a settlement prior thereto:

(1) Issue of employment as contended by Beck beginning April 1, 1970, at the rate of $100 per week;

(2) Issue of deficiency government payments to which Beck may be entitled;

(3) Damages for oats used by Lind;

(4) Damages to State land for overgrazing as sustained by Beck, the lessee;

(5) Damages for use of Quonset;

(6) Damages caused by overgrazing land leased, other than State land.

In remanding these issues for new trial, the conclusions of the trial court that Lind is entitled to an offset or credit in the amount of $1,766 no longer applies. In particular, the offset of $1,200 in the judgment allowed to Lind is hereby vacated and set aside. If, on retrial, Lind is entitled to an offset, the trial court may include that in its judgment.

 We conclude that the findings of fact by the trial court on the following items are adequately supported by substantial evidence and are, therefore, not clearly erroneous. Rule 52(a), N.D.R.Civ.P.

The following items in the judgment are affirmed:

(1) The value of 10 tons of hay used by Lind at $25 per ton, in the sum of $250;

(2) Dismissal of the action relating to a John Deere plow and drill;

(3) Denial of Beck's claim for $200 for the value of a Ford tractor; and

(4) Denial of claim for expenses of cattle passes.

 The claim for reimbursement of expenses with regard to the water well, which was denied by the trial court, is affirmed on the grounds and basis that the water well is an improvement to the real property and as such enhances the value of the real property.

The judgment of the trial court is reversed and remanded in part for a new trial, and affirmed in part.

ERICKSTAD, C. J., and PAULSON and VOGEL, JJ., concur.

PEDERSON, Judge (concurring specially).

I concur but find it necessary to add the following:

In this case Beck claimed that Lind used 1,000 bushels of oats worth fifty cents a bushel. Lind denied that he used any of the oats. The trial court concluded that Beck was entitled to an award of $300 for 600 bushels used.

The majority opinion finds this award to be erroneous because there is no evidence to support it. Not in every case where the only testimony on damage is either zero or $500 can we conclude that a $300 award is not supported by the evidence, but when there is a strong inference that the trier of fact compromised between the right to recover and the proved damages sustained, we are justified in concluding that there is error. See *Dege v. Produce Exchange Bank of St. Paul*, 212 Minn. 44, 2 N.W.2d 423, 425 (1942), and *Schore v. Mueller*, 290 Minn. 186, 186 N.W.2d 699, 702 (1971).