**BISMARCK HOSPITAL ASSOCIATION, a corporation, Plaintiff and Appellant,**

v.

**BURLEIGH COUNTY, North Dakota, a political subdivision of the State of North Dakota, Defendant and Respondent.**

No. 8275.

Supreme Court of North Dakota.

Dec. 8, 1966.

Fleck, Smith, Mather, Strutz, Mayer & Stewart, Bismarck, for plaintiff and appellant.

Albert A. Wolf, State's Atty. of Burleigh County, Bismarck, for defendant and respondent.

MURRAY, Judge (on reassignment).

This is a case tried without jury in the County Court of Increased Jurisdiction of Burleigh County.

Plaintiff-appellant Bismarck Hospital Association operates a facility called "Bismarck Hospital" (to be hereinafter so called), which sued the defendant-respondent Burleigh County, claiming indebtedness arising out of hospital services furnished by plaintiff at the request of the defendant, acting by and through the defendant's welfare department for and on behalf of eight of its welfare patients. The lower court dismissed plaintiff's complaint. Plaintiff appealed and demanded trial de novo.

Defendant-respondent has conceded in its brief that the statement of facts given in plaintiff-appellant's brief is true and correct. Therefore, said statement of facts will be reproduced here verbatim. This lengthy recitation of admitted facts is necessary in order to understand the complex historical relationship of the parties.

## "STATEMENT OF FACTS

"The background of the relationship between the Plaintiff and the Defendant which gives rise to the litigation here at bar may be summarized as follows:

"Prior to the date of April 1963, the Plaintiff, Bismarck Hospital Association, was bound by virtue of an agreement negotiated between the North Dakota State Welfare Board and the Hospital Associ-

ation of North Dakota to provide hospital care for welfare patients. These agreements were similar in nature to those set forth in Exhibits A, B, C and D. * * *

"The agreement was on a year-to-year basis and was adjusted annually by the Association and the North Dakota State Welfare Board. * * * The basis of adjustment was predicated upon the schedules of cost submitted by the various hospitals in certain bed group categories. * * *

"In April of 1963 the Hospital Association was notified by the North Dakota State Welfare Department that it would be necessary to adjust the per diem rate schedule on all hospitals, effective July 1, 1963. This for the reason that the appropriated funds of the North Dakota State Welfare Department indicated that an adjustment may be necessary. * * * Thereafter an adjustment was promulgated by the State Welfare Department, purportedly effective July 1, 1963, and the Hospital Association was then notified of the adjustment. * * * The adjustment was made by the State Welfare Department as set forth in Exhibit A, effective July 1, 1963.

"The North Dakota Hospital Association, after being advised of the purported adjustment, indicated its dissatisfaction of any adjustment to the North Dakota State Welfare Department. * * * As a result of the dissatisfaction, a subsequent readjustment was made in September of 1963, but the adjustment did not include the months of July through August of 1963. * * * Thus, during the months of July and August of 1963, there was no existing agreement between the North Dakota State Hospital Association and the North Dakota State Welfare Department as to a per diem rate schedule for hospital services. * * *

"It is also a fact that the North Dakota State Welfare Department notified

the Bismarck Hospital Association that the North Dakota State Welfare Department would not pay the Bismarck Hospital on the per diem rate schedule that had been established in the Spring of that year. * * *

"The relationship of the Burleigh County Welfare Department to the Welfare Department of the State of North Dakota is evidenced by virtue of the testimony of Miss Bertha Ellingson, the Director of the Burleigh County Welfare Board. Her testimony is to the effect that the per diem rate schedule of the counties is, in fact, based upon the agreements between the North Dakota State Welfare Department and the North Dakota Hospital Association [not to be confused with the plaintiff, Bismarck Hospital Association]. * * *

That in addition, as the Director of the Burleigh County Welfare Board, she knew that there had been a disruption in the per diem rate schedule existing between the North Dakota State Welfare Department and the North Dakota Hospital Association. She admitted that although she knew a disruption existed, she was advised by the State Welfare Department to continue paying the same per diem rate. * * * Miss Ellingson further stated that the Burleigh County Welfare Board accedes by agreement to the supervision and direction of the State Welfare Department. * * *

"The bills for services performed by the Bismarck Hospital Association relating to Welfare Patients of Burleigh County, North Dakota, are set forth in Plaintiff's Exhibits 1 through 21, inclusive, and as evidenced therein, the services were performed in the months of July and August of 1963. It is also disclosed from the exhibits that full payment to the Plaintiff was not made on the basis of the bill charges therein, but on the basis only of per diem schedules arbitrarily concluded by the Defendant. It is submitted that the difference be-

tween the actual bill charges and the amounts paid by Burleigh County to the Bismarck Hospital Association for those services is in the sum of $860.57."

Although each county welfare board purports to be an independent organization, it is subject to some state supervision and has to agree to certain policies of the State Welfare Department because a substantial part of its financing is derived from State and Federal funds. Even though each county has a responsibility of participating financially in all payments made in this public welfare program, these payments are made through the State welfare office, with part of such payments being charged back to the county to be paid out of its individual funds.

The difference between the actual bill charges and the amounts paid by Burleigh County to the Bismarck Hospital for these services is in the sum of $860.57, which is the amount in question in this action.

The Burleigh County Court of Increased Jurisdiction determined that, shortly before the transactions involved in this action, the parties had terminated their agreement as to the per diem hospital rates; that no notice of such termination was given to or received by the Burleigh County Welfare Board; and that the Bismarck Hospital made no effort to inform the Burleigh County Welfare Board that the per diem rates had been terminated. The court also found that the Bismarck Hospital proceeded to treat the patients involved and later filled out authorizations with a set of figures based upon private charges usual in the area but which were not contemplated by the Burleigh County Welfare Board. The court then concluded that there was no meeting of minds between the plaintiff and the defendant and therefore no contract of employment, but that the Bismarck Hospital could not recover on the basis of the reasonable value of services performed because an implied agreement existed between the parties created by practice and usage, which by law

continued in existence until revoked by one of the parties or until such time as the Bismarck Hospital informed the Burleigh County Welfare Board of the fact that the per diem understanding had been terminated. As a result, the lower court found that the per diem rate agreement was still in effect during the period in question and should be the basis for payment by the Burleigh County Welfare Board to the Bismarck Hospital with the hospital's cause of action being dismissed.

An examination of the transcript reveals no real issues of fact or conflicts of testimony that are material here. This court does have before it a very definite question of law as to the purported existence of an implied contract after the termination of a previous agreement. It is also clear that, during the period of July and August of 1963, no express agreement was in existence.

Section 9–06–01 of the North Dakota Century Code defines express and implied contracts as follows:

"A contract is either express or implied. An express contract is one the terms of which are stated in words. An implied contract is one the existence and terms of which are manifested by conduct."

See also 1 Williston, Contracts (3d ed.) 8; 1 Corbin, Contracts 39–43.

The main difference between an express contract and an implied contract in fact is that in the former the parties arrive at their agreement by words, either oral or written, while in the latter their agreement is arrived at by a consideration of their acts and conduct. In both of these instances there is, in fact, a contract existing between the parties, the only difference being in the character of the evidence necessary to establish it. To constitute either the one or the other, the parties must occupy toward each other a contract status, and there must be that connection, mutuality of will, and interaction of parties.

See Cassaday v. De Jarnette, 251 Iowa 391, 101 N.W.2d 21; McInerney v. Detroit Trust Co., 279 Mich. 42, 271 N.W. 545; Balafas v. Balafas, 263 Minn. 267, 117 N.W.2d 20; Roberge v. Cambridge Cooperative Creamery, 248 Minn. 184, 79 N.W.2d 142; Lang v. Burns, 77 S.D. 626, 97 N.W.2d 863. 1 Corbin, Contracts 41, has this to say:

"The distinction between an express and an implied contract, therefore, is of little importance, if it can be said to exist at all. The matter that is of importance is the degree of effectiveness of the expression used. Clarity of expression determines the reasonableness of understanding and eases the court's problem in case of dispute. The character of the evidence to be presented to the court depends upon the mode of expression used: * * *"

1 Corbin, Contracts 43 says the following:

"Parties who have made an express contract to be in effect for one year (or any other stated time) frequently proceed with performance after expiration of the year without making any new express agreement, of extension or otherwise. From such continued action a court may infer that the parties have agreed in fact to renew the one-year contract for another similar period. Illustrations can be found in leaseholds, employment transactions, and contracts for a continuing supply of some commodity."

The last quotation from Corbin is not strictly applicable here, inasmuch as there was a direct break-off or cut-off in connection with the past terms of the contract, by the plaintiff. It is material, however, because it indicates the existence of an implied contract. Thus, express contracts and implied contracts are essentially based on the mutual intentions of the parties, with the former based on the express oral or written assent of the parties and the latter based on the surrounding facts and

circumstances as to whether the parties actually intended to enter into a contract but failed to articulate their promises. Under contracts implied in fact, the court merely attempts to determine from the surrounding circumstances what the parties actually intended. In these two types of contracts the general contract theory of compensatory damages is applied at the going contract rate as expressly or impliedly intended by the parties.

■ The record is quite explicit that no express agreement was in effect between the parties during the months of July and August of 1963, and the identification and nature of the implied agreement is not capable of facile definition, although said implied contract does exist. In this situation, it is to be recalled that the State Welfare Board was the first party to terminate the existing agreement, or per diem rate schedule, with the State Hospital Association because of inadequate appropriation. It then attempted to set up a new and lower per diem rate schedule which the State Hospital Association refused to accept because of its unsatisfactory amount. This failure to reach an agreement resulted in a two-month period of negotiations during July and August before a satisfactory rate could be arrived at between the parties. These circumstances substantially justify the trial court's finding that there was no express contract between the parties during this two-month period.

■ There was no express but an implied contract in existence during the period in question. The only obligation which the Burleigh County Welfare Board was under was that imposed by law, which was to pay on a *quantum meruit* basis for the reasonable value of the services furnished by the Bismarck Hospital, considering the existence of said implied contract, which inferred services without specifying an amount.

The law is well stated in this regard in the case of In re Voss' Estate, 20 Wis. 2d 238, 121 N.W.2d 744, at 746:

"On *quantum meruit*, a common count in the historical action of *assumpsit*, recovery is allowed for services performed for another on the basis of a contract implied in law or an implied promise to pay the performer for what the services were reasonably worth. Mead v. Ringling (1954), 266 Wis. 523, 528, 64 N.W.2d 222, 65 N.W.2d 35; Johnson v. Higgins-McArthur Co. (1959), 99 Ga. App. 260, 108 S.E.2d 299, 303. * * *"

■ Literally translated, the phrase "*quantum meruit*" means "as much as he deserved" or "as much as he deserves." It rests on an obligation imposed by law, for reasons dictated by reason and justice, and it may be distinct from liability on an implied contract proper, or contract implied in fact, or it may be compatible and in co-existence with such an implied contract. An essential prerequisite to any such liability on *quantum meruit* is the acceptance of benefits by the one sought to be charged, rendered under such circumstances as reasonably to notify him that the one performing such services was expecting to be paid compensation therefor. 35A, Words and Phrases 417. See also Dunn v. Phoenix Village, Inc., D.C., 213 F. Supp. 936 (Ark.1963); Ochiltree County v. Hedrick, Tex.Civ.App., 366 S.W.2d 866; Dallas Joint Stock Land Bank v. Colbert, Tex.Civ.App., 127 S.W.2d 1004.

■ Bismarck Hospital has performed valuable services for and on behalf of the Burleigh County Welfare Board at its request. The amount of compensation asked by Bismarck Hospital for services performed by it for the welfare patients in question is the reasonable value for such services performed for other patients in the Bismarck community, and the compensation asked for in this situation should be enforced in the absence of an explicit agreement to the contrary.

The next issue which we must resolve is what effect the lack of formal notice from the Bismarck Hospital to the Burleigh County Welfare Board, as to its

intention to charge the Burleigh County Welfare Board the individual full rate for its welfare patients rather than the previously agreed upon per diem rate, had in this situation. The resolution of this issue depends upon whether or not there was an agency relationship involved between the Burleigh County Welfare Board and the North Dakota State Welfare Board in permitting the State Welfare Board to act for and on behalf of Burleigh County in negotiating the per diem rate charges with the North Dakota Hospital Association.

According to Section 3–01–01, N.D.C.C.:

"Agency is the relationship which results where one person, called the principal, authorizes another, called the agent, to act for him in dealing with third persons."

Section 3–01–04, N.D.C.C. provides that:

"Any person having capacity to contract may appoint an agent and any person may be an agent."

Section 3–01–07, N.D.C.C. provides that:

"The relationship of principal and agent can be created although neither party receives consideration."

The establishment of an agency relationship is set forth in the case of Popejoy v. Eastburn, 241 Iowa 747, 41 N.W.2d 764, at 768, where the court stated:

"The relationship of principal and agent is not dependent upon express agreement between the parties—it may be implied from either words or conduct of the parties depending upon the circumstances of the case. * * *

"In Greenlease-Lied Motors v. Sadler, 216 Iowa 302, 249 N.W. 383, 386, we said: 'The term "agency" was not used, but "where the facts are such as to create an agency, as a matter of law, the actual intention of the parties and the name they give to their relation are immaterial; they cannot agree that facts which in law establish the relation of agency shall not establish that relation or shall establish a different relation. * * * The relation of agency does not depend upon an express appointment and acceptance thereof, but it may be, and frequently is, implied from the words and conduct of the parties and the circumstances of the particular case. It may be implied from a single transaction."' * * * *'

"In the case of State v. Reynolds, 209 Iowa 543, 228 N.W. 283, 285, this court had before it the question of agency and its establishment. Therein we quoted from 21 R.C.L. p. 820. 'Direct evidence is not indispensable—indeed, frequently is not available—but instead circumstances may be relied on, such as the relation of the parties to each other and their conduct with reference to the subject matter of the contract.'"

See also Thornton v. Budge, 74 Idaho 103, 257 P.2d 238.

In this situation the relationship between the Burleigh County Welfare Board and the State Welfare Board is one of ambiguity. Mr. Leslie O. Ovre, Director of the Public Welfare Board of the State of North Dakota, testified that, approximately eight years ago, the individual county welfare boards agreed to transfer a certain amount of responsibility to the State Welfare Board in connection with payments to hospitals and in negotiating with the State Hospital Association to set up the annual per diem rate schedule for welfare patients of the various county welfare boards. The State Welfare Board's dealing was confined primarily to conversations and correspondence with the State Hospital Association, and it did not engage in any negotiations or dealings with any individual hospitals. Mr. Ovre stated that when there was any change in rates, the State Welfare Board would send the material to the State Hospital Association and the material would then be distributed to the individual hospitals by the association.

The State Welfare Board also distributed the same material to its individual county welfare boards. Mr. Ovre stated that, although each county had a responsibility of participating financially in all payments made in a public welfare program, the payments were made through the State office; with part of the payments made for these particular cases being charged back to the county to be paid out of county funds. Whatever authorizations were made for treatment and payment of welfare patients, however, were made through the county office and not through the State welfare office. Mr. Ovre admitted that during July and August of 1963 there was no purported, existing agreement between the Bismarck Hospital and the State Welfare Department as to charges on a per diem basis.

Miss Ellingson, Director of the Burleigh County Welfare Board, testified that, although the State had no binding authority to negotiate on behalf of Burleigh County for the establishment of a per diem rate, the county per diem rate is based upon these agreements by the State with the State Hospital Association. She also testified to the fact that the Burleigh County Welfare Board had conferences with the State of North Dakota, Mr. Ovre, and other officials and that the said board got bulletins from the State.

Thus, although the Burleigh County Welfare Board had, physically, no notice of Bismarck Hospital's intention to discontinue its per diem rate schedule in favor of the individual bill rate schedule, the State Welfare Board was made fully aware of Bismarck Hospital's position, and even admitted the lack of an existing agreement with the State Hospital Association. It also appears from the record that, for the specific purpose of setting up a per diem rate schedule with the Bismarck Hospital through the State Hospital Association, the State Welfare Board was acting as agent for and on behalf of the Burleigh County Welfare Board in that particular capacity. Although it appears that Burleigh County may not have been expressly bound by these negotiations by the State Welfare Board according to its agreement with the State Welfare Board, Burleigh County was in effect bound by such agreement because of the financial ties between the two organizations even though Burleigh County in effect is an independent organization. Thus, even though the Burleigh County Welfare Board and the State Welfare Board may not have expressly intended to set up or to enter into an agency relationship, the over-all legal effect of their relationship in this situation was one of principal and agent for the purpose of setting up a per diem rate schedule.

There are statutes pertaining to the agency relationship, involving welfare matters, which should also be considered:

"50–01–09. Duties of county welfare board.—The county welfare board of each county in this state shall have the following duties:

\* \* \* \* \* \*

2. To supervise and administer, under the direction and supervision of the public welfare board of North Dakota, such relief and welfare activities in the county as may be financed in whole or in part by or with funds allocated or distributed by the public welfare board of North Dakota; \* \* \*"

"50–06–06. Powers and duties of the board.—The public welfare board shall have the following powers and duties:

\* \* \* \* \* \*

8. To co-operate with and advise and assist the various county welfare boards in every way possible; \* \* \*"

Section 3–03–05, N.D.C.C., provides that:

"As against a principal, both principal and agent are deemed to have notice of whatever either has notice and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."

Thus the Burleigh County Welfare Board had, legally, knowledge of Bismarck Hospital's intention to charge Burleigh County at the individual full-rate basis for the treatment of its authorized welfare patients during the period in question, because the State Welfare Board did have knowledge of such intention and it was the State Welfare Board's duty and responsibility to notify the Burleigh County Welfare Board of the discontinuance of the per diem rate schedule. This, the State Welfare Board apparently neglected to do.

Therefore, Bismarck Hospital is entitled to recover the difference between what it received from Burleigh County at the previously terminated per diem rate schedule and the reasonable value of the services performed for Burleigh County welfare patients. It is undisputed that this amount is $860.57. Accordingly, judgment is reversed with instructions that judgment shall be entered in favor of plaintiff and against defendant for $860.57, together with allowable costs and disbursements.

TEIGEN, C. J., and ERICKSTAD, STRUTZ and KNUDSON, JJ., concur.