**JERRY HARMON MOTORS, INC.,**
Plaintiff and Appellee,

v.

**Gary HETH, Defendant and Appellant.**

**Civ. No. 10 078.**

Supreme Court of North Dakota.

Feb. 18, 1982.

McIntee & Whisenand, Williston, for plaintiff and appellee; submitted on briefs.

Bjella, Neff, Rathert, Wahl & Eiken, Williston, for defendant and appellant; submitted on briefs.

SAND, Justice.

This appeal stems from a motor vehicle transaction between Jerry Harmon Motors, Inc., Williston, North Dakota [Harmon],

and Gary Heth, also of Williston [Heth]. On 22 February 1980, Heth and a friend, John Holter, went to Harmon looking for a work vehicle. The sales manager, D. K. Long [Long], showed Heth a 1979 GMC 4-wheel drive van. Heth looked at it and inquired how much it would cost. Long checked the invoice and quoted the price of $8,500.00, plus tax and license. Heth inquired as to what he would have to do to own the vehicle and was told that a down payment of $1,800 was required and that a contract would have to be executed. Long also advised Heth that a radio cassette would be installed, whereupon Heth and Long executed a car order[1] which in part stated:

| | |
|---|---|
| Price | $ 8,500.00 |
| Tax | 255.00 |
| Registration fee | 45.00 |
| Total | $ 8,800.00 |
| Down Payment | $ 1,800.00[2] |

Heth testified at trial that he signed the car order and a retail installment contract and made the required $1,800 down payment, then he left to secure insurance for the van. Heth further testified that when he returned for the van a half hour later, he was told the cost of converting the van to 4-wheel drive had not been included in the quoted price.

Jess Gregory Ditsworth [Ditsworth], credit manager for Harmon, testified that the car order was signed and then Heth left to get insurance, and that the retail installment contract was signed after Heth secured the insurance. Ditsworth testified that while Heth was away he looked at the invoice and noticed that the price of the conversion kit (4-wheel drive unit)[3] was not

included in the price listed on the invoice and after Heth returned he informed Heth that the quoted price of $8,500.00 did not include the price of the conversion kit. Ditsworth further testified that the price of the conversion kit was not included in the retail installment contract because Harmon had not received an invoice for it from the manufacturer and consequently did not know the exact cost of the kit.

The record reflects that Heth asked Ditsworth how much the conversion kit would cost and that Ditsworth told him he did not know exactly how much it would cost but suggested prices ranging from $1,000 to $2,000. Ditsworth testified that it was his understanding that Heth would pay for the cost of the conversion kit, whatever it was, and based on that understanding he allowed Heth to take the van.

Heth testified that, in regard to the conversion kit, Ditsworth told him he would have to pay the invoice price submitted to Harmon by GMC and that the price would be between $1,200 and $2,000. Heth further testified that although he "understood" that Harmon had told him it was his obligation to pay for the conversion kit, he did not "agree" to pay for it and, as far as he was concerned, the conversion kit was part of the original purchase price.

Harmon received the invoice in the amount of $3,168.10 for the conversion kit and billed Heth that amount. Heth failed to pay and this action was instituted by Harmon against Heth. After a bench trial, the district court entered findings of fact, conclusions of law, and order for judgment and issued a judgment in the amount of $3,168.10 against Heth and in favor of Harmon. Heth appealed.

---

1. The car order contained a notation, under the heading "Exception," stating "Install AM and FM cassette 150." Harmon Motors didn't have a radio at the time. The parties agreed that this was part of the original agreement. The original car order (white copy) also contained a notation under the heading "Exception" stating "Customer pays for conv. whatever cost is." This notation was not on the purchaser's copy (yellow copy), but was only on the original.

2. The $1,800 down payment was a check from John Holter for a pickup that Heth sold to him. This check is not in question nor has a problem with the check been encountered.

3. Harmon's employees or agents testified that GMC does not make a 4-wheel drive vehicle but has that specialty work done by a third party, a subsidiary or whatever, and that is why the cost is not on the vehicle's invoice but is treated as a separate or extra charge for the installation of the 4-wheel drive conversion kit.

The issue as raised by Heth is whether or not the trial court erred in finding that he was unjustly enriched in the amount of $3,168.10. Heth points out that he contracted to purchase a 4-wheel drive van for the price of $8,500.00 plus tax and license and that the conversion kit should be included in the price of the van.

A careful examination of pertinent findings of fact and conclusions of law will be beneficial in narrowing the issues and in resolving them.

## "FINDINGS OF FACT

### "I.

"Gary Heth purchased a 1979 GMC van from Jerry Harmon Motors, Inc. on the 22nd day of February, 1980 for a quoted price of $8,500.00.

### "II.

"Gary Heth went to the credit manager of Jerry Harmon Motors, Inc., Greg Ditsworth, and indicated that financing would be needed and attempted to make his own arrangements for insurance.

### "III.

"Gary Heth departed from Jerry Harmon Motors, Inc. in order to procure insurance, with his yellow copy of a car order form.

### "IV.

"Gary Heth returned to Greg Ditsworth's office a short while later, and immediately Greg Ditsworth told him that the 1979 GMC van could not be sold at the quoted price because the cost of the 4-wheel drive conversion kit had not been included in the quoted price.

### "V.

"The invoice from General Motors for the 4-wheel drive conversion kit had not yet been received by Jerry Harmon Motors, Inc. Only the invoice for the van itself had been received, and such invoice did not include the 4-wheel drive conversion kit.

### "VI.

"Gary Heth asked how much the kit would cost, and Mr. Ditsworth indicated he did not know, but suggested figures ranging from $1,000.00 to $2,000.00.

### "VII.

"Greg Ditsworth told Mr. Heth he could take the van that day if he would promise to pay the invoice price of the conversion kit, whatever it was, when the invoice was received by Jerry Harmon Motors, Inc.

### "VIII.

"After much discussion, the sale was completed, the final papers signed, a down payment made and Gary Heth departed with his newly purchased vehicle.

### "IX.

"Jerry Harmon Motors, Inc.'s copy of the car order form contains the notation 'customer to pay for conversion, whatever cost is'.

### "X.

"There is, however, a discrepancy; the yellow copy of the car order form, which was given to Gary Heth, does not include the above stated notation. This is a close question, and the Court is of the belief that the Plaintiff did not carry its burden of proof that there was a valid contract, either actual or implied, obligating the Defendant to pay the invoice price for the conversion kit.

### "XI.

"Gary Heth understood that the quoted price given to him did not include the cost of the conversion kit, but that he would be billed later for the invoice cost when and if Jerry Harmon Motors, Inc. ever received an invoice from General Motors.

"XII.

"When the invoice was received by Jerry Harmon Motors, Inc. and forwarded to Gary Heth, it exceeded the estimate of the figures given by Greg Ditsworth and the expectations of Gary Heth.

"XIII.

"Although there was no binding contract between Gary Heth and Harmon Motors, Inc. concerning the conversion kit, nevertheless, the Defendant is liable for it on the ground that he would be unjustly enriched if he was permitted to keep it without payment.

"XIV.

"The reasonable value of the 4-wheel drive conversion kit is $3,168.10."

"CONCLUSIONS OF LAW

"II.

"There is insufficient proof to show that a contract, either actual or implied, was entered into by and between Jerry Harmon Motors, Inc. and the Defendant, Gary Heth, as to payment for the invoice price of the 4-wheel drive conversion kit.

"III.

"The Defendant is liable for reasonable cost of the 4-wheel drive conversion kit on the ground that he would be unjustly enriched if he were permitted to keep it without payment."

Pursuant to finding of fact No. XIII and conclusion of law No. 2, the court concluded that there was no binding contract, either actual or implied, between Heth and Harmon concerning the conversion kit, but the court found that Heth was liable for the reasonable value of the conversion kit under the theory of unjust enrichment.

Findings of fact supported by the evidence are not clearly erroneous and will not be set aside under Rule 52(a), North Dakota Rules of Civil Procedure, unless we are left with a definite and firm conviction that a mistake has been made. *Keidel v. Rask*, 290 N.W.2d 255 (N.D.1980). We recognize that some of the findings are a mixture of conclusions of law and findings of fact, and that conclusions of law are fully reviewable by this Court. *Northwestern Bell Telephone Co. v. Board of Commissioners of Fargo*, 211 N.W.2d 399 (N.D.1973). Unfortunately, the court made no specific finding of fact as to the understanding between Harmon and Heth relative to the cost of the conversion kit, as will be discussed later herein.

Prior to reviewing the particular findings, a discussion of the law relative to quasi contracts and contracts will be helpful.

Section 9–06–01, North Dakota Century Code, provides as follows:

"A contract is either express or implied. An express contract is one the terms of which are stated in words. An implied contract is one the existence and terms of which are manifested by conduct."

Express contracts and implied contracts are based on the mutual intentions of the parties. *Bismarck Hospital Ass'n v. Burleigh County*, 146 N.W.2d 887 (N.D.1966). Express contracts are based on the express oral or written assent of the parties, and implied contracts are based on the surrounding facts and circumstances to determine whether or not the parties actually intended to enter into a contract but failed to articulate their promises. *Id.*

The law recognizes two classes of implied contracts: contracts implied in fact and contracts implied in law, more commonly referred to as quasi or constructive contracts. *Gate City Savings and Loan Ass'n v. International Business Mach. Corp.*, 213 N.W.2d 888 (N.D.1973).

When dealing with contracts implied in fact the court is required to determine from the surrounding circumstances what the parties actually intended. *Bismarck Hospital Ass'n v. Burleigh County, supra.*

In *Stark County v. State*, 160 N.W.2d 101, 105 (N.D.1968), we stated the following with reference to contracts implied in law or quasi contracts:

"A quasi contract arises where a transaction between parties gives them mutual rights or obligations, but does not involve a specific agreement between them. Such contracts are obligations created by law for reasons of justice. Receipt of benefits, which it would be inequitable to retain without paying therefor, constitutes the essence of quasi-contractual obligations."

■ Quasi contracts impose an obligation for reasons of justice and are founded upon principles of unjust enrichment. *Gate City Savings and Loan Ass'n v. International Business Mach. Corp., supra.*

In *A & A Metal Buildings v. I–S Inc.*, 274 N.W.2d 183 (N.D.1978), we discussed the equitable jurisdiction of courts of this state and concluded that courts, under certain circumstances, may provide a remedy where none otherwise exists at law provided the complaint sufficiently gives notice to the parties of the relief and demand sought.

We also said:

"Unjust enrichment is an equitable theory that may be used when a person retains a benefit which in justice and equity belongs to another. *Schildberg Rock Products Co. v. Brooks*, 258 Iowa 759, 140 N.W.2d 132, 138–39 (1966); *Gard v. Razanskas*, 248 Iowa 1333, 85 N.W.2d 612, 614 (1957); and *Federal Corporation v. Radtke*, 229 Wis. 231, 281 N.W. 921, 923 (1938). Under the theory, a 'person shall not be allowed to profit or enrich himself inequitably at another's expense.' *Alburn v. Union Trust Co.*, 80 N.E.2d 721, 729 (Ct.Com.Pl.Ohio 1947), citing 43 Words and Phrases, Undue Influence, Perm.Ed., page 272. When a person has been unjustly enriched at the expense of another, he must make restitution to the other. *Gard v. Razanskas, supra* 85 N.W.2d at 614." *A & A Metal Bldg. v. I–S, Inc.*, 274 N.W.2d 183, 188–189.

■ The unjust enrichment doctrine generally rests upon quasi or constructive contracts implied by law to prevent a person from unjustly enriching himself at the expense of another. It also rests:

". . . on the principle that whatsoever it is certain that a man ought to do, that the law supposes him to have promised to do. The obligation to do justice rests on all persons, and if one obtains money or property of others without authority, the law, independently of express contract, will compel restitution of compensation.

.     .     .     .     .

"The essential elements of quasi contract are a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof. . . . The person receiving the benefit is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.

.     .     .     .     .

"A valid claim for unjust enrichment can be based only on an element of misconduct or fault or undue advantage taken by one party of another, and, in the absence of fraud or bad faith, a person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was agreed between them that the other should give in return. Also, a person is not unjustly enriched by retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution." 17 C.J.S. *Contracts* § 6, pages 570–574.

See also, 66 Am.Jur.2d *Restitution and Implied Contracts*, § 3, Unjust Enrichment, page 945. The same authority on the measure of recovery of damages, § 166, page 1097, closes with the following statement:

"In any case, however, it is a fundamental principle that restitution is granted to the extent, and only to the extent, that justice between the parties requires."

Restatement of the Law, Restitution, § 149, page 596, states that the measure of

restitution is determined with reference to the tortiousness of the defendant's conduct or the negligence or other fault of one or both of the parties in creating the situation giving rise to the right to restitution. This authority states:

> "If he was no more at fault than the claimant, he is not required to pay for losses in excess of benefit received by him and he is permitted to retain gains which result from his dealing with the property."

■ Unjust enrichment is an outgrowth of what was formerly referred to as a quasi contract, an equitable concept. Equity is a two-way street and must be recognized as such whenever the court employs equity to resolve a dispute.

A review of the discussions between Heth and representatives of Harmon relative to the conversion kit will be helpful to the resolution of the issues presented in this case.

The discussion between Heth and agents or salesmen of Harmon regarding the cost of a 4-wheel drive conversion kit involved the figures of $1,000 to $2,000. These figures were followed with the statement, "whatever it will cost" or "whatever the invoice will bill us," and if Harmon received no invoice he would not be billed. This could easily be understood to mean $1,000 or $2,000, whatever it will be between those two figures. The phrases, "whatever it will cost" or "whatever the invoice will bill us" in the context used could well be understood to mean anywhere from $1,000 to $2,000, but not more than $2,000. If the phrases had been used without first stating a dollar figure, a different construction and meaning could be placed upon them. The difference between the top amount stated and the actual billing is not a small amount. In fact, the actual billing is 58.4% ($1,168.10) more than the top figure mentioned, $2,000.

Findings of fact Nos. VI, VII, VIII and XI reflect that some type of "understanding" concerning the conversion kit resulted from the discussions between Heth and Ditsworth. The court found there was no contract to pay the invoice price for the conversion kit; however, the other findings establish an understanding by Heth that he would have to pay some amount for the conversion kit.

The court's finding of fact XI that Heth understood he would be billed later for the cost of the 4-wheel drive unit conversion kit did not include any specific figure nor did it indicate what was meant by the specific understanding as to cost. The court found that the kit had a reasonable value of $3,168.10, but no finding was made as to what Heth understood the value to be, nor does any finding reflect an understanding by Harmon as to the value of the conversion kit. As a result, this question has not been fully answered.

■ Whenever the trial court fails to make indispensable findings of fact, this Court should make the findings if the interests of justice require. *Kovash v. Transwestern, Inc.,* 197 N.W.2d 629 (N.D.1972). But, see also, *Struchynski v. Decker,* 194 N.W.2d 741 (N.D.1972).

■ Finding of fact XIII is a mixture of fact, law and argument. The statement, "Although there was no binding contract between Gary Heth and Harmon Motors, Inc." is ambiguous and, understood in one way, would be inconsistent with finding of fact XI. If the court meant to say that there was no binding contract regarding the conversion kit as to a specific amount or when payments were to be made, then it would be consistent with the rest of the findings, but if the court, in effect, found there was no contract, quasi, implied, or otherwise, regarding the conversion kit, then the judgment is without proper foundation. The same applies to conclusion of law II. If the conclusion is, in effect, stating that there is no contract as to the specific amount and when and how payment is to be made, then it is proper, but if the conclusion is that no contract, implied or quasi, was reached regarding the payment for the conversion kit, then the judgment is improper.

We construe both findings of fact[4] XIII and conclusion of law II that no agreement was reached as to the specific cost of the conversion kit or when and how payment was to be made, but a quasi agreement was reached that the conversion kit was deemed an extra item, the cost of which was to be paid by Heth. The evidence supports such finding of fact.

From the cold record we can reasonably infer that Heth understood the discussion as to cost to mean between $1,000 and $2,000, whatever the invoice will show, but not to exceed $2,000. We believe this is the reasonable construction of the cold record regarding the discussion. We are not implying that Harmon employed deception, but rather that Harmon through its representatives initially made a mistake by not including the price of the 4-wheel drive conversion kit in the price originally quoted to Heth.[5]

We believe that equitable considerations and the interests of justice and judicial economy require us to consider this mistake along with the $1,000-2,000 figure suggested to Heth in reaching the conclusion that Heth would pay the invoice price of the conversion kit in an amount up to $2,000. In reaching this conclusion we believe some type of understanding existed between Heth and Harmon to the effect that Heth would have to pay for the conversion unit or kit separately.

The record does not contain any evidence from which we can determine if Heth would have backed away from the deal had he known the actual cost ($3,168.10) of the conversion unit or kit. Neither does the record reflect that Harmon gave Heth an opportunity to back out of the deal. The reasonableness of the cost is not at issue.

While Harmon did not expressly give Heth an opportunity to withdraw from the car deal, neither did Heth indicate any desire to withdraw from the car deal. However, the record discloses that after the

discussion about the conversion kit, its cost and the expectation that the purchaser (Heth) would pay for it, Heth got into the van and drove away. In doing so he impliedly agreed to pay for the conversion kit, but in an amount not to exceed $2,000. This, in effect, amounted to a quasi or implied contract, bringing into operation the unjust enrichment doctrine. However, we also believe that the suggestion of the cost ranging from $1,000-2,000 could have created and left the impression and understanding with Heth that the cost in no event would be more than $2,000, and therefore, based upon equitable considerations, Harmon's recovery should be limited to $2,000.

Accordingly, we remand the case with instructions that the judgment be reduced from $3,168.10 to $2,000.00 and that neither party be entitled to assess costs on appeal.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.

---

4. Heth moved to have the findings amended to support his contention that the conversion kit was to be considered a part of the car (van) deal, but the court denied his motion.

5. This may raise the further question as to whether or not Heth was entitled to rescind. However, this question is not before us.